140 N.J. Super. 190 (1976)
356 A.2d 4
ARMANDO PELLICCIONI, PLAINTIFF-APPELLANT,
v.
SCHUYLER PACKING COMPANY AND PENN CENTRAL TRANSPORTATION COMPANY, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued February 17, 1976.
Decided March 10, 1976.
*192 Before Judges CARTON, CRAHAY and HANDLER.
Mr. George J. Duffy argued the cause for appellant (Messrs. Baker, Garber, Duffy & Baker, attorneys).
Mr. John M. Walsh argued the cause for respondent Penn Central Transportation Company (Messrs. Schumann, Hession, Kennelly & Dorment, attorneys; Mr. Alan H. Kress, of counsel).
*193 Mr. Martin B. Wallerstein filed statement in lieu of brief on behalf of respondent, Schuyler Packing Company (Messrs. Morgan, Melhuish, Monaghan and Spielvogel, attorneys).
The opinion of the court was delivered by CARTON, P.J.A.D.
Plaintiff brought this common law negligence action against defendant Schuyler Packing Company and for negligence under the Federal Employers' Liability Act (FELA), 45 U.S.C.A. §§ 51 to 60, against defendant Penn Central Transport Company.
At the conclusion of the trial before a jury, the judge dismissed the action against both defendants. On appeal this court affirmed the action of the trial court, and the New Jersey Supreme Court denied certification, 65 N.J. 290 (1974).
The United States Supreme Court granted plaintiff's petition for writ of certiorari (Pelliccioni v. Schuyler Packing Co., 419 U.S. 1099, 95 S.Ct. 769, 42 L.Ed. 796 (1975)), vacated this court's judgment, and remanded the matter for reconsideration of the action against Penn Central in light of Kelley v. Southern Pacific Co., 419 U.S. 318, 95 S.Ct. 472, 42 L.Ed.2d 498 (1974).
Although plaintiff raised a number of issues on his direct appeal, the single issue relevant on remand is whether plaintiff made out, on the record below, a jury question that he was, at the time of the injury, an employee of Penn Central within the meaning of the FELA.
In FELA cases brought in the state courts, the rights and obligations of the parties are governed by the act, 45 U.S.C.A. §§ 51 to 60, and by federal principles of common law. See, e.g., Chesapeake & Ohio R. Co. v. Kuhn, 284 U.S. 44, 46-47, 52 S.Ct. 45, 76 L.Ed. 157 (1931). Plaintiff and Penn Central correctly agree that the employer-employee question is ordinarily a fact question for the jury. Ward v. Atlantic Coast Line R. Co., 362 U.S. 396, 80 S.Ct. 789, 4 L.Ed.2d 820 (1960); Baker v. *194 Texas & Pacific R. Co., 359 U.S. 227, 79 S.Ct. 664, 3 L.Ed.2d 756 (1959).
Thus, the only true federal question remaining is whether the trial court applied the correct legal principles in concluding that plaintiff had not made out a jury question on the issue of his status as an employee of Penn Central.
The presence of a federal question is, of course, the sine qua non of the exercise of appellate jurisdiction by the United States Supreme Court over a decision of a state court. See, e.g., Henry v. Mississippi, 379 U.S. 443, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965); Martin v. Hunter's Lessee, 1 Wheat. 304, 4 L.Ed. 97 (U.S. 1816); 28 U.S.C.A. § 1257; Hart & Wechsler, The Federal Courts and the Federal System (2 ed. 1973) at 470-526.
The Supreme Court's vacation order is directed only toward this court's determination of the federal question raised by plaintiff. Hence, we will not, as we need not, reconsider plaintiff's other points of reversal; they are left for possible reconsideration by the New Jersey Supreme Court. Cf. Schuylkill Trust Co. v. Pennsylvania, 302 U.S. 506, 58 S.Ct. 295, 82 L.Ed. 392 (1938); Georgia Ry. Co. v. Decatur, 297 U.S. 620, 56 S.Ct. 606, 80 L.Ed. 925 (1936), noting that state courts, after a United States Supreme Court remand, are free to alter  subject only to the state's jurisprudence  prior decisions in the case on state law so long as the altered decision is consistent with the federal Supreme Court's ruling on the federal question presented and remanded.
There is no substantial dispute as to the underlying facts. At all relevant times plaintiff was employed as a "yard driver" by New York Central Transportation Company (Transport), a wholly-owned subsidiary of defendant Penn Central. As part of his job plaintiff operated a yard tractor, known as a "commando," to tow truck-trailers from place to place in Penn Central's North Bergen yard. The trailers themselves were either incoming or outgoing via Penn Central trains.
*195 On March 22, 1969 plaintiff was towing a trailer that had been packed with meat by defendant Schuyler Packing Company. While making a left turn over rough ground, the trailer tipped onto its side, taking the yard tractor and plaintiff with it. Plaintiff's claim is that substantial injuries resulted from the accident.
Plaintiff alleged that defendant Penn Central had negligently maintained its yard and that the rough and uneven condition of the yard roadway had precipitated the accident. Plaintiff also claimed that the Nebraska packing company had loaded the trailer unevenly, thus making it unstable. Finally, in order to seek the benefits of the FELA, plaintiff alleged additionally that he was only nominally an employee of New York Transport and that, in reality, he was employed by Penn Central.
Transport was formed originally by defendant Penn Central's predecessor railroad, the New York Central. (In 1968 New York Central merged into the Penn Central.)
The record below reveals that plaintiff had been employed by Transport since July 1967; that the North Bergen yard where plaintiff was injured was owned and controlled by defendant Penn Central; that Penn Central police patrolled the yard; and that only Penn Central trains were serviced by the yard and by Transport. There was further testimony that plaintiff was always paid by Transport; that he took direct orders from his foreman, a Transport employee; that he never took direct instructions from a Penn Central employee, and that he was a member of the Teamsters Union, and not a railroad union.
The trial judge, for the purposes of his dismissal order, also considered certain documentary evidence (originally excluded) as received. That evidence consisted of a 1960 petition by Transport to the Interstate Commerce Commission (ICC) for a modification by the ICC of Transport's scope of operations; a brief submitted in support of that *196 petition[1] and certain admissions made by Penn Central during the litigation here on appeal. All three bear on the relationship between Penn Central and Transport and will be considered in some detail below.
In dismissing the action (and provisionally excluding the documentary evidence) the trial judge took the position that the sine qua non of an employer-employee relationship for FELA purposes was the ability of the putative employer (Penn Central) to exercise direct supervisory control over the manner in which plaintiff carried out his day-to-day job activities.
The basic issue before us, as a result of the remand, is whether, from the proofs tendered in the trial court under the criteria delineated by the Supreme Court, a jury could reasonably conclude that plaintiff was an employee of defendant Penn Central.
The standard to be applied here is the federal one for removing a fact question from jury consideration. Any fact question  here plaintiff's employment status  must go to the jury unless "reasonable men could not reach differing conclusions on the issue * * *." Baker v. Texas & Pacific Ry. Co., 359 U.S. 227, 228, 79 S.Ct. 664, 665, 3 L.Ed.2d 756 (1959). Under the remand order we are required to reconsider that fact question in light of Kelley v. Southern Pacific Co., 419 U.S. 318, 95 S.Ct. 472, 42 L.Ed.2d 498 (1974).
In Kelley plaintiff was an employee of a wholly-owned subsidiary of a railroad. He was injured when he fell from the top of a railroad car while unloading automobiles. As here, Kelley claimed that, although he was technically employed by a transport company wholly owned by the parent railroad, he was sufficiently under the control of the railroad to bring him within the coverage of FELA. 419 U.S. at 319, 95 S.Ct. at 474. The District Court found that the *197 transport company served generally as the railroad's agent and that that principal-agent relationship was sufficient to bring plaintiff under the protection of FELA. 419 U.S. at 320, 95 S.Ct. at 474. The Court of Appeals reversed, Kelley v. Southern Pacific Co., 486 F.2d 1084 (9 Cir.1973), and the Supreme Court granted certiorari to resolve an apparent conflict between the Courts of Appeals for the Fourth and Ninth Circuits.
The Supreme Court concluded that the trial court had erred and rejected the determination that the existence of a principal-agency relationship was sufficient to make an employee of the agent also an employee of the principal for FELA purposes. 419 U.S. at 323, 95 S.Ct. at 476. In the majority opinion, expressing the views of six of its members, the court stated: "[T]his Court has repeatedly required more than [an agency relationship] to satisfy the `while employed' clause of the FELA. From the beginning the standard has been proof of a master-servant relationship between the plaintiff and the defendant railroad." 419 U.S. at 323, 95 S.Ct. at 476 (emphasis supplied).
In discussing the possibilities for the requisite master-servant relationship to exist in a two employers one worker situation (the fact pattern presented in Kelley and this appeal), the Court noted three methods
* * * by which a plaintiff can establish his "employment" with a rail carrier for FELA purposes even while he is nominally employed by another. First, the employee could be serving as the borrowed servant of the railroad at the time of his injury. * * * Second, he could be deemed to be acting for two masters simultaneously. * * * Finally, he could be a subservant [sic, probably servant] of a company that was in turn a servant of the railroad. * * * [419 U.S. at 324, 95 S.Ct. at 476 (citations omitted)]
Under the "borrowed servant" doctrine, one master enters into an agreement with a second by which the second (for example) borrows the servants of the first. The borrowing master thus becomes the borrowed servant's master while the borrowed servant is performing the borrowing *198 master's tasks. See, e.g., Linstead v. Chesapeake & Ohio Ry., 276 U.S. 28, 4 S.Ct. 241, 72 L.Ed. 453 (1928); Williams v. Louisville & National R.R. Co., 398 F. Supp. 683 (S.D. Ohio 1975); Helton v. United States, 309 F. Supp. 479, 484 (E.D. Ark. 1969).
The one servant serving two masters situation arises when two employers share equally in the direct supervision and control of one servant. See 1 Restatement, Agency 2d, § 226 at 498 (1958).
We are satisfied that there is no factual support in the present record for plaintiff's contention that he was either a borrowed servant or acting for two masters. It is devoid of anything which suggests that plaintiff ever had direct dealings of a master-servant nature with defendant Penn Central. Consequently, if plaintiff is to be entitled to protection under the FELA it must be by virtue of the subservant doctrine. We note that the trial judge did not specifically consider this approach. The court placed its ruling on the sole ground that plaintiff had never been subject to the direct supervisory control of Penn Central employees.
There is no dispute, of course, that plaintiff was a servant of Transport. Thus, under the general and accepted principle of master and servant relationship, if reasonable jurors could conclude on this record that Transport was, in turn, a servant of Penn Central, then plaintiff was entitled to go to the jury on the issue of whether he was a subservant of Penn Central.[2]
Each case involving the existence or not of a master and servant relationship generally must be determined on its own facts. See, e.g., Byrne v. Pennsylvania R.R. Co., 262 F.2d *199 906 (3d Cir.), cert. den. 359 U.S. 960, 79 S.Ct. 798, 3 L.Ed.2d 766 (1959). While the element of control is generally an important  even the most important  determinant in ascertaining whether a master and servant relationship exists, control is not the be-all and end-all of the inquiry. All of the surrounding circumstances must be considered. Dow v. Connell, 448 F.2d 763 (10th Cir.1971), cert. den. 405 U.S. 921, 92 S.Ct. 957, 30 L.Ed.2d 792 (1972).
The Restatement defines a servant as
* * * a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control. [1 Restatement, Agency 2d, § 220(1) at 485 (1958)]
In a comment to that subsection the author points out that the relation of master and servant is one not capable of exact definition and it is for the trier of fact to determine whether there is a sufficient group of favorable facts, some of which are set forth in Section 220(2), to establish that relation.
Restatement, Agency 2d, § 5(2) at 21 (1958), defines a subservant as
* * * a person appointed by a servant empowered to do so, to perform functions undertaken by the servant for the master and subject to the control as to his physical conduct both by the master and by the servant, but for whose conduct the servant agrees with the principal to be primarily responsible.
We consider the proofs, and particularly the probative value of the documentary evidence relating to the relationship between Penn Central and Transport in light of these general definitions and the subservant theory of recovery referred to in Kelley.
An important factor to be considered is the essential nature of the functions performed by Transport. The evidence suggests that Transport never operated as an independent common *200 carrier. It operates under ICC authority as a "substituted motor-for-rail" service.[3] Such service is defined as existing
* * * when the railroad-affiliated motor carrier in a subordinate capacity aids the railroad in its rail operations by enabling the railroad to give better service or operate more cheaply rather than independently competing with other motor carriers. [United States v. Rock Island Motor Transit Co., 340 U.S. 419, 442, 71 S.Ct. 382, 395, 95 L.Ed. 391 (1951)]
Substituted motor-for-rail service supplements existing rail service. For example, in its 1960 application Transport sought to extend its operations in a manner that would permit the railroad to shut down some 33 handling stations. It was to the railroad's economic advantage to confine delivery of less than carload lots to a minimum of handling stations. What it proposed was to concentrate deliveries on 12 major points and run trucks from those points to the areas previously served by the 33 handling stations whose elimination was sought.
In describing its operations in its 1961 brief, Transport noted that (1) the railroad publishes all the tariffs under which the freight moved; (2) Transport solicits no business, all business being solicited by the railroad; (3) shipments move under rail rates; (4) Transport collects no charges; (5) Transport serves only the railroad's points; (6) the extent and frequency of Transport's operations are entirely dependent on the railroad's freight concentration points and needs; (7) Transport has no terminals of its own.
The very purpose of substituted motor-for-rail service is improved operating efficiency for the railroad. In its petition *201 to the ICC, Transport noted that approval of its application would save the railroad some $1.5 million annual "break bulk" expenses. Throughout the 1960 petition and 1961 brief, Transport's activities are described as "auxiliary to and supplemental of [Penn Central's predecessor's] rail service." The word "subordinate" is also employed.
Responding to plaintiff's requests for admissions, Penn Central admitted, among other things, that Transport has, since its organization in 1956, been owned by Penn Central and its predecessor, and that the directorships of Penn Central and Transport interlock.
This documentary evidence strongly suggests that the main, if not the only, reason for Transport's continued existence was to further the railroad business of its parent corporation; that it was designed to accomplish that purpose, and that the operations in which plaintiff was engaged when he was injured were in fact directed towards that objective. The arrangement between the two companies was an open-ended and on-going one. A jury could reasonably find that, irrespective of whether Penn Central exercised the right to control the employee's activities, it certainly was open to the jury to find that it had that right. In this respect the factual situation is more favorable to the employee than that presented in Kelley. There the subsidiary of the parent railroad company, although performing trucking enterprises primarily in conjunction with railroad operations, was engaged in various other trucking enterprises. 419 U.S. at 320, 95 S.Ct. at 474.
It is undisputed that the directorships of the two corporations interlock and that Transport is a wholly-owned subsidiary of Penn Central. Transport itself described its operation as subordinate and auxiliary to Penn Central's rail service. A jury could reasonably find from the evidence that Transport solicits no business, collects no charges, has no terminals, and depends entirely on concentrations of freight at places designated by the railroad at its discretion. A *202 factual basis was established for the conclusion that Transport was organized for and continues to serve only the interests of the railroad.
While none of these factors may be individually decisive on the issue, we are of the opinion that this evidence, including the evidence relating to plaintiff's employment at the time of the accident, was sufficient to warrant submission to the jury of the question whether there existed a master and servant relationship between Penn Central and Transport and whether, under all of the surrounding circumstances, plaintiff as the employee of Transport was an employee of Penn Central within the meaning of FELA under the subservant doctrine.
The matter is accordingly remanded to the trial court for a new trial on this basis.
NOTES
[1] We were informed at oral argument that the petition and brief were prepared by railroad attorneys, not by Transport attorneys.
[2] Following the Supreme Court's remand of Kelley, the trial court concluded that the transport company there was "[a]t all times relevant to this case * * * acting as the servant of [the railroad] * * *." Kelley v. Southern Pacific Co., no. C-45344 AJZ (U.S. Dist. Ct. N.D. Calif., September 3, 1975). We are informed by Penn Central that Southern Pacific has again appealed to the United States Court of Appeals.
[3] A railroad's prerogative to operate a motor carrier through a subsidiary  subject to ICC supervision and approval  is unquestioned. Railway Executive's Ass'n v. United States, 355 U.S. 141, 78 S.Ct. 195, 2 L.Ed. 158 (1957); 49 U.S.C.A. §§ 5(2) (b) and 307. We note that we are not confronted with a situation in which a railroad corporation simply purchased or created an independent trucking company.