ROBERT R. WATTS, DANIAL K. NEWMAN, PAUL F. NARDELLA, DENNIS A. THORSON, DANNA PARROW, and JACK LOWE,

Plaintiffs and Appellants,

v.

MONTANA RAIL LINK, INC., a Montana corporation, and LIVINGSTON REBUILD CENTER, INC., a Montana corporation,

Defendants and Respondents.

No. 94-039.

Argued June 10, 1997.

Submitted June 12, 1997.

Rehearing Denied April 22, 1999.

Decided February 8, 1999.

Appeal from the District Court of Park County.

Sixth Judicial District. Honorable Kenneth R. Wilson, Judge.

Plaintiffs filed action alleging injuries during their employment by a company they claimed was part of Montana Rail Link and sought damages under the Federal Employers Liability Act (FELA). The District Court held that the plaintiffs were not employed by a common carrier by railroad for purposes of coverage by FELA. Plaintiffs appealed. The Supreme Court, Justice Trieweiler, held that: (1) based upon the facts, Montana Rail Link did control the employer's operations and the district court erred when it ruled otherwise; and (2) the plaintiffs were, at the times they complained

they were injured, employees of Montana Rail Link, Inc., and therefore, covered by the Federal Employers Liability Act.

Reversed.

JUSTICE GRAY dissenting, joined by CHIEF JUSTICE TURNAGE.

For Appellants: Monte D. Beck (argued) and John J. Richardson (argued), Beck & Richardson; Bozeman.

For Respondents: Ronald B. MacDonald (argued) and Darla J. Keck; Datsopoulos, MacDonald & Lind, P.C.; Missoula (for Montana Rail Link); Jon T. Dyre (argued); Crowley, Haughey, Hanson, Toole & Dietrich, P.L.L.P.; Billings; and Kenneth D. Tolliver (argued); Wright, Tolliver & Guthals, P.C.; Billings (for Livingston Rebuild Center).

JUSTICE TRIEWEILER delivered the opinion of the Court.

¶1 Plaintiffs filed complaints in the District Court for the Sixth Judicial District in Park County in which they named the Livingston Rebuild Center, Inc. (LRC), and Montana Rail Link, Inc. (MRL), as defendants and sought damages pursuant to the Federal Employers Liability Act (FELA) found at 45 U.S.C. §§ 51 to 60. They allege that they were injured during the course of their employment while nominally employed by LRC, but that LRC was actually the servant of MRL, which engaged in the business of common carrier by railroad in interstate commerce. The plaintiffs sought damages from the defendants, MRL and LRC, for their injuries. The defendants denied the material allegations of the plaintiffs' complaint and alleged, among other affir[293 Mont. 169]mative defenses, that the plaintiffs could not recover FELA benefits against LRC because it is

not a railroad, and that they could not recover FELA benefits against MRL because they were not employed by MRL. Pursuant to the motion of MRL, these cases were consolidated for the sole purpose of determining whether the plaintiffs were covered by FELA. Following a nonjury trial, the District Court found that they were not employed by MRL and entered judgment for the defendants. Plaintiffs appeal from the judgment of the District Court. We reverse that judgment.

¶2 The issue on appeal is whether the District Court erred when it held that plaintiffs were not employed by a common carrier by railroad for purposes of coverage by the Federal Employers Liability Act found at 45 U.S.C. §§ 51 to 60.

STANDARD OF REVIEW

¶3 The District Court found that MRL exercised no unusual control over LRC's employees and that LRC's relationship with MRL was an arms-length relationship typical of its business with its other customers. On that basis, the court concluded that MRL did not control LRC's employees and, therefore, that they were not subservants of a company that was, in turn, a servant of the railroad, and were not entitled to claim benefits pursuant to FELA. We review a district court's findings of fact to determine whether they are clearly erroneous. See Interstate Prod. Credit Ass'n v. DeSaye (1991), 250 Mont. 320,323, 820 P.2d 1285, 1287. We review a district court's conclusions of law to determine whether they are correct. See Carbon County v. Union Reserve Coal Co. (1995), 271 Mont. 459,469, 898 P.2d 680, 686; see also Kreger v. Francis (1995), 271 Mont. 444, 447, 898 P.2d 672, 674; Steer, Inc. v. Department of Revenue (1990), 245 Mont. 470, 474-75, 803 P.2d 601, 603-04.

¶4 We have adopted a three-part test to determine whether a finding is clearly erroneous.

First, the Court will review the record to see if the findings are supported by substantial evidence. Second, if the findings are supported by substantial evidence we will determine if the trial court has misapprehended the effect of the evidence. Third, if substantial evidence exists and the effect of the evidence has not been misapprehended, the Court may still find that "[A] finding is 'clearly erroneous' when, although there is evidence to support it, a review of the record leaves the court with the definite and firm conviction that a mistake has been committed."[293 Mont. 170] Interstate Prod. Credit Ass'n, 250 Mont. At323, 820 P.2d at 1287 (citations omitted).

APPLICABLE LAW

¶5 In Kelley v. Southern Pacific Co. (1974), 419 U.S. 318, 95 S. Ct. 472, 42 L. Ed. 2d 498, the U.S. Supreme Court established the standard for determining whether a person nominally employed by an entity that is not a railroad is, in fact, an employee of a railroad for purposes of coverage by FELA. In that case, the petitioner, Eugene C. Kelley, was technically employed by Pacific Motor Trucking Company, a wholly owned subsidiary of the Southern Pacific Company. His employment involved unloading automobiles from Southern Pacific's flat cars, and during the performance of his duties he fell from the top of one of the railroad's cars and was injured. He filed suit against the railroad in which he alleged that he was employed by the railroad within the meaning of FELA. The federal district court agreed on the basis of the trucking company's agency relationship with the railroad. However, the circuit court of appeals reversed on the basis that an agency relationship was insufficient and that the federal district court had not found that Kelley was

directly employed by Southern Pacific Company.

¶6 On appeal, the Supreme Court agreed that a simple agency relationship between the trucking company and the railroad was insufficient to bring Kelley within the coverage of the Act. It pointed out that pursuant to 45 U.S.C. § 51, coverage of the Act is extended to persons employed by a common carrier by railroad and injured by the negligence of the railroad, its officers, agents, or employees. It held, however, that an employment relationship could be established based on common law principles without regard to Southern Pacific's denial that it was Kelley's employer. The court stated:

Under common-law principles, there are basically three methods by which a plaintiff can establish his 'employment' with a rail carrier for FELA purposes even while he is nominally employed by another. First, the employee could be serving as the borrowed servant of the railroad at the time of his injury. See Restatement (Second) of Agency § 227; Linstead v. Chesapeake & Ohio R. Co., 276 U.S. 28, 48 S.Ct. 241, 72 L.Ed. 453 (1928). Second, he could be deemed to be acting for two masters simultaneously. See Restatement § 226; Williams v. Pennsylvania R. Co., 313 F.2d 203, 209 (C.A.2 1963). Finally, he could be a subservant of a company that[293 Mont. 171] was in turn a servant of the railroad. See Restatement § 5(2); Schroeder v. Pennsylvania R. Co., 397 F.2d 452 (C.A.7 1968).

Kelley, 419 U.S. at 324, 95 S. Ct. at 476, 42 L. Ed. 2d at 506.

¶7 The Supreme Court held that since the district court had failed to make findings based on the

correct test for FELA coverage, the case should be remanded to the district court for further findings consistent with the Supreme Court's decision.

¶8 In Warrington v. Elgin, Joliet & Eastern Railway Co. (7th Cir. 1990), 901 F.2d 88, the Seventh Circuit Court of Appeals discussed the type of proof necessary to establish an employment relationship and, therefore, entitlement to FELA benefits based on the third method recognized in the Kelley case. That court stated:

In order to prevail under this method, Warrington must demonstrate that USS was acting as a servant of EJ & E [the railroad] at the time of the accident. Section 220(1) of the Restatement (Second) of Agency defines a servant as "a person [or entity] employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control." See also Kelley, 419 U.S. at 326, 95 S.Ct. at 477; Vanskike v. ACF Industries, Inc., 665 F.2d 188, 198-99 (8th Cir. 1981). Section 220(2) of the Restatement lists various indicia of control which, among others, are instructive in determining servant status. Although these factors are directed at determining whether a particular bilateral arrangement is properly characterized as a master-servant or independent contractor relationship, they are also useful in analyzing a three-party relationship between two employers and an employee. Kelley, 419 U.S. at 324, 95 S.Ct. at 476.

Warrington, 901 F.2d at 90 (footnote omitted).1

1. Section 220(2) of Restatement (Second) of Agency provides the following factors which

should be considered in determining whether a master-servant relationship exists:

(2) In determining whether one acting for another is a servant or an independent contractor, the following matters of fact, among others, are considered:

(a) the extent of control which, by the agreement, the master may exercise over the details of the work;

(b) whether or not the one employee is engaged in a distinct occupation or business;

(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;

(d) the skill required in the particular occupation;

(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

(f) the length of time for which the person is employed;

(g) the method of payment, whether by time or by the job;

(h) whether or not the work is part of the regular business of the employer;

(i) whether or not the parties believe they are creating the relationship of master and servant; and

(j) whether the principal is or is not in business.

[293 Mont. 172]

¶9 [1] Among those factors typically considered for purposes of determining whether a master-servant relationship exists, the most significant is the degree of control that the alleged

master exercises over the work of that person or entity who is alleged to be its servant. See Tarboro v. Reading Co. (3d Cir. 1968), 396 F.2d 941, 943; Clifford v. United States (D. S.D. 1970), 308 F. Supp. 957, 958; Bond v. Cartwright Little League, Inc. (Ariz. 1975), 536 P.2d 697, 702; Miller v. Component Homes (Iowa 1984), 356 N.W.2d 213, 217; Molloy v. Massachusetts Mortg. Corp. (Mass. App. Ct. 1998), 1998 WL 15938 1; Kilgore Group, Inc. v. South Carolina Employment Sec. Comm'n (S.C. 1993), 437 S.E.2d 48, 49; Felts v. Richland County (S.C. 1991), 400 S.E.2d 781, 782.

¶10 For example, in Kottmeyer v. Consolidated Rail Corp. (Ill. App. Ct. 1981), 424 N.E.2d 345, the plaintiff sued Consolidated Rail Corporation for benefits pursuant to FELA, even though at the time of his injury he was employed by Pennsylvania Truck Lines, Inc., a wholly owned subsidiary of the defendant railroad. Employees of the subsidiary corporation loaded and unloaded trailers from the defendant's flatbed cars. Following a jury trial, a verdict was returned finding that the plaintiff was, in fact, employed by the railroad and awarding him damages pursuant to FELA. On appeal, the railroad contended that there was insufficient evidence to establish that the plaintiff was its employee. However, the Court of Appeals for the State of Illinois noted that Kelley established the applicable law and that applying common law principles to the plaintiff's and the railroad's relationship, "the railroad's 'control or right to control' the performance of the services provided by the plaintiff accordingly becomes the key issue." Kottmeyer, 424 N.E.2d at 351.

¶11 The Illinois Court observed that:

Cases following Kelley have recognized the importance of control in determining

"employment":

[293 Mont. 173]"'Supervision' is a criterion that in importance far exceeds the others. As used in this context, supervision means control of the individual workman's physical conduct [citation], not just oversight; 'control [of] the individual in the performance of his work and [of] the manner in which the work is done ... is usually decisive.' [Citation omitted.] Employers are distinguished from independent contractors most basically by the detail with which the party for whom the work is eventually produced actually supervises the manner and means by which the work is performed; and degree of control or supervision is the principal element that differentiates employees and independent contractors at common law, in the state statutory context, and in the context of other federal statutes as well." [Footnotes omitted.] (Lodge 1858, American Federation of Government Employees v. Webb (D.C. Cir. 1978), 580 F.2d 496, 504-505.)

Proof of employment is not strictly limited to evidence of actual control or supervision by the railroad over the physical conduct of the plaintiff, however. Proof that the railroad had the right to control the employee's activities serves as well. (Pelliccioni v. Schuyler Packing Co. (1976), 140 N.J.Super. 190, 356 A.2d 4.) Such evidence both meets the Restatement definition of "servant" (Restatement (Second) of Agency § 220(1) at 485 (1958)) and tends to establish the third method outlined by the court in Kelley by which plaintiff who is nominally employed by another can prove employment (i.e., subservant of a company in turn a servant of the railroad). In

determining whether the railroad had the right to control the employee's activities, all of the surrounding circumstances must be considered. (Pelliccioni.) In fact, the Restatement outlines a number of non-exclusive factors to be considered in determining the existence of a master-servant relationship. (Restatement (Second) of Agency § 220(2) at 485-486 (1958).)

Kottmeyer, 424 N.E.2d at 352 (alteration in original).

¶12 In the Kottmeyer case, the Illinois Court held that evidence of the railroad's supervision of trucking company employees, the railroad's control of the premises where the trucking company's employees worked, and the fact that on occasion trucking company employees had worked on railroad equipment, was sufficient to establish that the plaintiff was the servant of a company which, in turn, was the servant of a railroad.[293 Mont. 174]

¶13 With these rules in mind, we will review the evidence presented to the District Court.

FACTUAL BACKGROUND

¶14 Railroad repair shops were built in Livingston by the Northern Pacific Railroad in 1883 to maintain the locomotives and cars used on its trains. The Burlington Northern Railroad took over operation of those shops in 1970 and performed both running repair and major repair at that location. Running repair included scheduled maintenance, inspections, and minor service, such as grease, oil, and filter changes which do not require taking a locomotive out of service. It is performed in a facility known as a roundhouse. Major repair is done in that part of a repair facility known as the back shop. It includes rebuilding damaged locomotives and cars and overhauling

motors or other mechanical parts of a locomotive, and requires that the locomotive or car being worked on be taken out of service.

¶15 The BN closed its roundhouse at the end of 1982 and its back shop in 1985.

¶16 In late 1986 or early 1987, the Washington Corporation, whose principal shareholder is Dennis Washington, was approached by an investment banker about purchasing BN's southern line, which included its trackage and facilities from Laurel, Montana, to Sand Point, Idaho. Washington arrived at a general agreement regarding price for BN's southern line in the summer of 1987, and he and several other investors formed Montana Rail Link, Inc. (MRL), in the fall of 1987 for the purpose of purchasing, owning, and operating a railroad over that line for the transportation of freight and goods. After its formation, MRL acquired lease rights to BN's southern line, purchased some branch lines, operating equipment, including locomotives, cars, and maintenance equipment, and agreed that other industrial properties could be included in the transaction by negotiation at a future date.

¶17 Other than that part of BN's Livingston repair shops which was included in the right- of-way for its southern line, the major repair facilities were not included in the original discussions between BN and the principals who ultimately formed MRL. However, at some point in the negotiations, the MRL principals had noticed that a significant piece of property in Livingston had not been included and it was suggested that it be conveyed as part of the transaction. That change was made after consideration for the transaction had been agreed upon at no additional cost to MRL.[293 Mont. 175]

¶18 MRL's original business plan made no provision for a running repair facility, nor for any participation in major repairs or rebuilding locomotives. It anticipated minimal running repairs by MRL's work force at locations other than Livingston, and all heavy repairs done by other providers. One anticipated source of major repair work was BN's facility in Glendive.

¶19 MRL began operations in October 1987 and sent locomotives to BN for repairs that could not be made by MRL in Missoula or Laurel. They found this arrangement unsatisfactory, however, because it took too long to get locomotives to BN and back, and it was costing more money than MRL concluded it would cost to do minor repairs on its own locomotives. The time that their locomotives were out of service became significant because MRL had more business volume than had been anticipated in its business plan. By October 1988, MRL was doing its own running repair at the Livingston facility.

¶20 The principals in MRL also recognized that it was cheaper to have major repairs and locomotive rebuilding done by what they referred to as "contract employees," rather than railroad employees. Contract employees were simply those who worked for some company other than a railroad. Therefore, shortly after MRL decided to do its own running repair at the repair facilities in Livingston formerly operated by BN, the principals in MRL also formed another company known as Livingston Rebuild Center, Inc. (LRC), for the purpose of operating the back shop at the Livingston repair facilities where major or heavy repair work could be done and where rebuilding locomotives could also be accomplished. LRC was incorporated in January 1988, and began operations in June of that year, doing work identical to that which had been done by BN at the same location.

¶21 The land which LRC occupied at the time of trial was originally owned by MRL and included that land added to the transaction late in MRL's negotiations with BN. It originally consisted of fifty-six acres and was transferred to LRC by MRL on January 4, 1988. Although the facilities on that property were insured by LRC in November 1988 for $8,000,000, and the land and improvements were appraised during 1988 for tax purposes at nearly $3,200,000, MRL received no consideration for the property when it was transferred to LRC.

¶22 It was disputed at the time of trial whether a major repair facility, like the one for which LRC was created, was necessary to MRL's operation of its railroad. It was generally agreed that if major repair work was not done in Livingston, the next closest major repair facility [293 Mont. 176]was in Boise, Idaho, and that prior to the creation of LRC, MRL's major repair work was being done as far away as Illinois. A number of LRC employees testified that MRL would not have been able to continue operating the railroad without a back shop for the repair of locomotives because the fleet of locomotives that it inherited from BN was, on the average, twenty to twenty-five years old, and that many of those locomotives were in need of major repair. In fact, in July 1988, MRL's chief mechanical officer indicated that in order to meet industry standards and produce a fleet with an average age comparable to other railroads, MRL would have to rebuild two locomotives a month for 1989, and one per month each of the following four years, at a cost of between $300,000 and $600,000 per locomotive. Even MRL's principals agreed that a railroad cannot operate without major repair of its cars and locomotives and that it has generally been less expensive to have that work done in Livingston than at a distant location. MRL apparently has

never purchased a new locomotive.

¶23 In spite of these facts, railroad officials testified at trial that while major repair work was necessary, it was not necessary that it be done in Livingston. What all parties did agree on was that it was cheaper to have major repair work done by an independent contractor like LRC than by railroad employees. Because of the difference in union and non-union wages, and because of the cost of railroad retirement benefits, Bill Brodsky, the president of MRL, estimated a thirty-seven percent reduction in labor expense by having LRC do rebuild work, rather than BN, and a twenty-two percent savings compared to having that work done by MRL employees. According to Dorn Parkinson, the chairman of MRL's board of directors, an estimated nineteen percent savings could be realized for the cost of labor by avoiding just the cost of railroad retirement benefits.

¶24 It was undoubtedly because of these cost factors that the principals in MRL formed LRC. From the time that LRC was formed in 1988 until this case was tried in May 1993, the two companies had common ownership and control. Of the thirty-two shareholders who invested in MRL, thirty-one invested in LRC and constituted all of LRC's owners. The Dennis Washington Trust owned 79% of the stock in MRL, and 78.49% of the stock in LRC.

¶25 Dennis Washington was originally the chairman of the board of directors for both MRL and LRC, but was replaced by Parkinson, the president of Washington Corporation in 1986. Parkinson continued to serve as chairman of the board of both corporations at the time of[293 Mont. 177] trial. Brodsky, the president and a director of MRL, is also a shareholder in LRC, and

all of LRC's directors at the time of trial were employees of the Washington Corporation.

¶26 Based on this common ownership and control, it is not surprising that LRC's original business plan anticipated receiving one-hundred percent of MRL's major repair work, and that it did; that even at the time of trial, seventy percent of LRC's work was done for MRL; and that when from time to time MRL suggested, based on its needs, that LRC add service, that was done.

¶27 Since the shareholders of any corporation choose its directors, and since Dennis Washington is the principal shareholder of both corporations, he effectively exercised control over both companies by choosing each company's directors.

¶28 It is perhaps because of this ownership and control that LRC was investigated by the Railroad Retirement Board, which decided in 1989 that LRC was an employer within the meaning of the Railroad Retirement Act and, therefore, liable for payment of railroad retirement and railroad unemployment insurance contributions for its employees.

¶29 Although "employer" is statutorily defined for purposes of railroad retirement coverage, and although that definition is not identical to the common law test that we apply in this case, it does include the common consideration of "control."

¶30 The definition of an employer contained in § 1(a) of the Railroad Retirement Act (45 U.S.C. § 231(a)(1) (1976)2) reads, in part, as follows:

The term "employer" shall include--

(i) any express company, sleeping car company, and carrier by railroad, subject to part I of the Interstate Commerce Act;

(ii) any company which is directly or indirectly owned or controlled by, or under

common control with, one or more employers as defined in paragraph (i) of this subdivision, and which ... performs any service ... in connection with the transportation of passengers or property by railroad, or the receipt, delivery, elevation, transfer in transit, refrigeration or icing, storage, or handling of property transported by railroad ....

(Emphasis added.)

2. The 1976 version of the Railroad Retirement Act was relied upon and quoted by the Railroad Retirement Board.

[293 Mont. 178]

¶31 Based on this statutory definition and the common ownership and control previously discussed, the Deputy General Counsel for the Railroad Retirement Board held that: The mutual use of directors by MRL and LRC and the fact that the same individual is president, chairman of the board and principal shareholder of both MRL and LRC indicates that LRC clearly falls within these provisions. Therefore, I find that LRC is under common control with one or more railroad employers. (See 20 C.F.R. 202.4 and 202.5; see also legal opinion L-89-19).

....

Based upon the above discussion, it is my opinion that Livingston Rebuild Center, Inc., is an employer under the Railroad Retirement and Railroad Unemployment Insurance Acts by reason of its being under common control with a railroad employer

and performing service in connection with the transportation of passengers and

property by rail.

United States Gov't Memorandum R.R. Retirement Bd., L-89-85 (July 7, 1989).

¶32 LRC did not appeal the Railroad Retirement Board's determination that it was under

common control with a railroad employer. It did appeal the determination that it performed service

in connection with the transportation of passengers and property by rail. However, that finding and

conclusion was affirmed by the Seventh Circuit Court of Appeals in Livingston Rebuild Center,

Inc. v. Railroad Retirement Board (7th Cir. 1992), 970 F.2d 295.

¶33 While we do not conclude that the decision of the Railroad Retirement Board or the Seventh

Circuit Court of Appeals is dispositive of the issue in this case, we do think the Board's finding that

LRC was under control of the principals in MRL is probative of the issue in this case. In addition,

there was other undisputed evidence of the practical ways in which MRL's control over LRC was

manifested.

Land Exchanges

¶34 One indication of MRL's effective control over LRC was the manner in which property was

transferred from and to MRL without consideration or with less consideration than full market

value, based on MRL's perception of its own self-interest.

¶35 For example, the land which LRC now occupies was, as noted, transferred from MRL to

LRC without consideration, following LRC's creation in 1988. The land consisted of fifty-six acres

and included not [293 Mont. 179]only the facilities out of which LRC currently operates the back

shop, but also a trailer park and lumber yard at another location on the property. Even after the original transfer, MRL continued to occupy a portion of the property where it operated its running repair shop, but paid LRC no compensation for the use of that land. There was an advantage to MRL in not owning the land because it was potentially a superfund clean-up site, and even though BN was ultimately responsible for the cost of clean-up, substantial out-of-pocket expenses could have been incurred prior to reimbursement from BN. LRC transferred 4.66 acres back to MRL in January 1989. This land included the running repair shop where MRL continues to operate. However, once again, no consideration exchanged hands.

¶36 Even after the trailer park was transferred to LRC, MRL continued to receive all of the rental proceeds from the operation of the trailer park. Then in July 1990, LRC also transferred the trailer park and the lumber yard back to MRL without consideration.

¶37 As part of the original transaction, MRL transferred to LRC a wastewater treatment plant. In 1992, when the principals in MRL became concerned about LRC's solvency, and knowing that the wastewater treatment plant was indispensable to MRL's operation, the principals in LRC, who were the same people, agreed to transfer the wastewater treatment plant to MRL for approximately $145,000. This is in spite of the fact that Dale McLeary, who at that time was the comptroller of LRC, advised Parkinson, who was then chairman of the board for both LRC and MRL, that the taxable value of the plant was $658,000, the original cost was $1,400,000, and the replacement cost of the wastewater treatment plant, which was also essential to LRC's operation, would be $2,139,000. Instead of owning the wastewater treatment plant, LRC ended up with an adjustable rental agreement for water usage which could be canceled on thirty-days' notice by

MRL.

¶38 None of these facts regarding the transfer of property back and forth between MRL and LRC are disputed. MRL's principals did testify that there was no reason to charge LRC for property for which MRL, in effect, paid no consideration to BN. They also argued that there was no reason to pay consideration to LRC when MRL recovered property that had been transferred to LRC by mistake. However, they offer no explanation for why one independent corporation dealing with another corporation in an arms-length transaction would convey property worth potentially millions of dollars at the second[293 Mont. 180] corporation's request simply because of a contention that it had originally been transferred to the first corporation by mistake.

¶39 The fact that these transfers were made without consideration or with inadequate consideration when MRL deemed a transfer in its best interest is undisputed and is strong evidence of MRL's control over LRC.

Physical Premises

¶40 LRC's major repair and rebuild facility, and MRL's running repair facility are all operated under one roof. When LRC's first employees arrived, they used MRL's facilities, including its running water, bathroom facilities, and lunch room because they had no facilities of their own. LRC employees frequently went to the MRL end of the building to discuss matters with other employees, borrow tools, or get necessary parts. In reality, the physical plant was originally operated just as it had been by BN when it performed both running repair and major operations at that facility. However, at some point during the Railroad Retirement Board's inquiry into the issue

of LRC's common control by owners of a railroad, a twelve-foot-high plywood wall was constructed separating LRC's operations from MRL's operations. The wall was constructed about six or seven months after LRC started business. However, LRC employees described the wall as more of an inconvenience than anything and testified that employees of each company were still frequently observed on the other company's side of the wall when it was necessary for their work. Paul Nardella, who worked for LRC, was told by Bill O'Neil, one of the company's vice presidents, that the wall was built for the purpose of creating separate companies in the event that Railroad Retirement Board people showed up to inspect the property. Furthermore, LRC continued to locate its offices on the second floor of what would be the MRL side of the wall.

¶41 MRL officials testified that the twelve-foot wall in a building with thirty-five-foot ceilings was erected for the protection of its equipment and parts. However, no one disputed that each company's employees still had access to the other company's premises and that the free exchange of tools, equipment, and parts continued.

Training and Supervision

¶42 Paul Nardella, who was hired by LRC on June 10, 1988, and who worked as an electrician in the locomotive shop, a radio man, and a[293 Mont. 181] road test man, testified that when he was trained as a radio man he was trained by MRL's personnel from Laurel.

¶43 Jesse Ross, who worked in LRC's paint shop from July 1988 until January 1989, testified that when he arrived as an employee, his supervisors were basically organized and trained by shop foremen from MRL. Although John Weish, MRL's general foreman of its mechanical division,

testified that he did not personally train people in LRC's paint shop, no one in a supervisory capacity for LRC otherwise contradicted the testimony of either Nardella or Ross about training.

¶44 Craig White testified that he worked for LRC in both the locomotive shop and the car shop from February 1989 until July 1991, and for a three-month period during the latter part of 1992. During that time, he observed Weish and Dan Smith, another MRL foreman, on LRC's side of the building several times a week, inspecting units owned by MRL and giving directions on how things were to be done. He stated that the inspection done by MRL officials involved more verbal interaction than the final inspections performed by other customers who were usually more concerned about the final product and did not get involved on a daily basis during the course of LRC's work. He stated that Smith, in particular, was on LRC premises continuously while work was being done, overseeing how things were going, making changes and suggestions, and advising LRC workers of what he wanted done.

¶45 Danna Parrow, who first went to work for LRC in 1989 and worked there until 1991, first in the locomotive shop and then in the area where air brake systems are repaired, and who had previously worked for BN when they ran the same facility, testified that Weish's involvement in her work was so pervasive that she actually thought he had authority to fire her.

¶46 Nardella testified that during the time he worked for LRC he saw Smith on the LRC side nearly every day in the back shop, and Weish on the LRC side of the building an average of three times per week. He testified that on occasion he saw MRL supervisors instructing LRC workers how to do their work, and that MRL supervisors did more than monitor quality control, which was the function of inspectors for other railroads. He felt that his daily work was supervised by MRL.

He testified that the extent and nature of inspections and hands-on involvement by MRL supervisors was totally different than that done by inspectors for any other railroad, and that MRL supervisors actually physically worked on locomotives with LRC employees.[293 Mont. 182]

¶47 Robert Watts, who went to work for LRC in June 1988 and worked there for two years, first in the paint shop, then as a crane operator, and then as a hostler moving locomotives from one spot to another, testified that Smith not only occasionally gave him advice on his work, but he actually saw Smith do work on a locomotive in their back shop. He testified that as opposed to inspectors from other railroads who just inspected the finished product, Weish was there every day when he worked in the paint shop. He stated that Smith even gave him occasional instructions while he was working on locomotives other than those owned by MRL.

¶48 John Bauer, who was a locomotive engineer employed by LRC since 1989, and who worked in both the back shop area and in locomotive repair, testified that his work had been supervised by Smith, who did work of his own on the same locomotives that LRC employees were working on. He had also seen Smith directing the work of other LRC employees. He stated that over the years he had been directed on how to do his work by Smith on a couple dozen occasions.

¶49 Dennis Thorson, who worked for LRC as a welder-fabricator in the locomotive shop and later in the car shop, testified that he had been directly supervised by Smith on a frequent basis and that he was occasionally ordered to go down to MRL's side of the building and do welding when that shop was busy and there was urgent work to be done. He stated that as opposed to the

inspectors from other companies, Smith acted more like a direct supervisor than a quality control inspector.

¶50 Chuck Winnett, the president of LRC since 1991, acknowledged that on occasion Dan Smith had told LRC employees what to do, but did not agree that the same was true for Weish.

¶51 Parrow, Watts, and Danial Newman, an employee in LRC's car shop, all testified that if there was a choice between doing work for two different companies, it was clear to them that they were to give MRL's work priority.

¶52 On one occasion, Parrow was interviewed by the producers of a video who asked her, in the presence of Dennis Washington, how she liked working for Mr. Washington's railroad.

¶53 In response to overwhelming evidence of MRL's control of LRC's daily work, MRL offered the testimony of Melvin Dinius, its chief mechanical officer, and Weish. Dinius testified that Weish's responsibility was simply to assure quality control of the work done by LRC, just as he did at other facilities around the country. He stated that Weish[293 Mont. 183] was not authorized to deal directly with LRC crews, and should have dealt with LRC supervisory personnel if he had concerns.

¶54 Weish also testified that on those occasions when he had been at LRC to inspect, it had merely been for the purpose of quality control, and that more often than not, an LRC supervisor had been present at the same time. However, he admitted that during the course of his inspections of MRL equipment, it would not be uncommon for him to comment to the people who were working on it if he noticed something that needed their attention.

¶55 Smith was not called by MRL to explain either his frequent presence on LRC's facilities or his active involvement in the supervision of LRC's employees. Nor did anyone else on behalf of MRL controvert the testimony given by LRC's employees regarding Smith's extensive involvement in and supervision of their work.

Parts, Tools, and Equipment

¶56 Jeff Ross testified that when he went to work for LRC, LRC did not have all of the tools that it needed and it constantly had to borrow tools from MRL. A number of employees testified that even after LRC was established in business, it was not uncommon for the two companies to share tools and equipment, including overhead cranes and forklifts, but that for a period of time, LRC employees borrowed tools from MRL on a daily basis. McLeary acknowledged that there were no records which reflected any payment from LRC to MRL or vice versa for the use of tools or equipment. Dinius, the chief mechanical officer for MRL since October 1987, testified that he was aware that LRC employees borrowed equipment and tools from MRL and that it was done with his approval.

¶57 LRC employees also testified to community boxes or baskets of parts that were shared between the two companies. Sometimes records were kept and sometimes they were not. However, during the early period of LRC's operation, records were not kept.

¶58 Dinius testified on behalf of MRL that it was not uncommon to borrow and loan equipment with other companies. However, no one testified that MRL exchanged equipment with anyone as frequently and regularly as it did with LRC.

Storage of Equipment

¶59 It was undisputed that MRL stored engines, generators, and other large pieces of equipment on LRC's premises, including its electrical shop, for long periods of time. McLeary admitted that LRC did[293 Mont. 184] not receive rental checks from MRL for this use of its buildings, even though other businesses which stored materials on LRC property did pay rent. William Brodsky, the president of MRL, acknowledged that he was aware that MRL parked cars and locomotives on LRC property without compensation to LRC. Chuck Winnett, the president of LRC, acknowledged that some of those cars and locomotives remained on LRC property for months or years. Dinius could not offer as examples any other railroads who freely stored their equipment on LRC property.

¶60 MRL's use of LRC's property in this manner was uncontradicted.

Control of Business Practices

¶61 The Washington Corporation, which was principally owned by Dennis Washington, had a procedural manual for companies like LRC which were also principally owned by Dennis Washington and which were referred to as Washington companies. It required that LRC's cash be managed by the Washington Corporation; that all non-budget purchases be approved by Parkinson, president of the Washington Corporation; that LRC could not open or close a bank account without approval by Helen Miller, an employee of the Washington Corporation; and that LRC contribute a designated percentage of its annual profits to a charitable foundation funded by other Washington companies and Dennis Washington. The manual even provides that wage increases have to be approved by the Washington Corporation president. The principal owner and

the president of the Washington Corporation are also the principal owner and chairman of the board for MRL. In other words, the owner of MRL and its board chairman controlled virtually every significant detail of LRC's financial operation. It was, perhaps, with these details in mind that the District Court observed that "there seems to be something Machiavellian about this case."

¶62 Although Parkinson denied that all of these policies were enforced, he did not deny that they were in effect and could have been enforced.

DISCUSSION

¶63 [2] We conclude, based upon those facts which are undisputed in this case, that MRL did control the operation of LRC, and that the District Court's Finding No. 24 that MRL and LRC had an arms-length relationship, and its Finding No. 27 that LRC functioned independently, are clearly erroneous. We also conclude that the Dis[293 Mont. 185]trict Court erred when it held that there was no evidence that MRL controlled the work of LRC. We conclude that a master-servant relationship between MRL and LRC is established by not only the common control of MRL and LRC through its ownership and directorship, but also MRL's direct, frequent, and unique supervision of LRC's employees; MRL's at-will acquisition of LRC's property when acquisition was in MRL's self-interest; LRC's dependence on MRL for training, tools, equipment, and parts; and MRL's use of LRC's property for its own purposes without compensation to LRC.

¶64 The relationship between MRL and LRC is not typical of two independent corporations acting in arms-length fashion. It is typical of one corporation being dependent on and controlled by another for the other's benefit. This relationship satisfies the requirement for finding that the plaintiffs

were subservants of a company that was, in turn, a servant of the railroad and, therefore, are entitled to coverage by the Federal Employers Liability Act as employees of MRL during the times in question.

¶65 The effect of this opinion, however, is limited to that time from LRC's creation until May 17, 1993, when majority ownership was transferred to Randy Peterson. LRC's status following that date is not before us and nothing said herein pertains to the present corporation.

¶66 [3] In summary, we conclude that the plaintiffs in this case were, at the times they complain they were injured, employees of Montana Rail Link, Inc., and therefore, covered by the Federal Employers Liability Act.

JUSTICES HUNT, NELSON, LEAPHART and REGNIER concur.

JUSTICE GRAY, dissenting.

¶67 I respectfully dissent from the Court's opinion. I would hold that the District Court's findings of fact are not clearly erroneous and its conclusions of law are correct and, on that basis, I would affirm that court's decision in its entirety.

¶68 I do not disagree with the "APPLICABLE LAW" portion of the Court's opinion. I agree that Kelley's third method of establishing an employment relationship is at issue in this FELA case and that, under that test, the plaintiffs must establish that the LRC is a servant of MRL such that the plaintiffs, in turn, are subservants. Moreover, the criteria set forth in the Restatement (Second) of Agency § 220(2), are applicable in making that determination and those criteria are, as expressly stated therein, "matters of fact." In addition, as Kottmeyer instructs, the question of whether the plaintiffs were "employed" by a[293 Mont. 186] common carrier by railroad under Kelley's third

method of establishing such employment also is a question of fact for the finder of fact, based on all relevant evidence. See Kottmeyer, 424 N.E.2d at 352- 53. Importantly, the Kottmeyer court was reviewing the jury's special interrogatory verdict finding the plaintiff had been employed by the railroad at the time of his injury to determine whether sufficient evidence supported the jury's finding. See Kottmeyer, 424 N.E.2d at 347. Our proper role here is the same: to determine whether the findings in favor of MRL and the LRC regarding control and employment made by the District Court--acting as the factfinder in this case--are supported by the evidence.

¶69 My biggest problem with the Court's opinion is that, having correctly stated the applicable law, the Court thereafter fails to apply it. In other words, having set forth the applicable legal principles, including the criteria contained in § 220(2) of the Restatement (Second) of Agency, the Court's opinion never again mentions--much less applies--the law.

¶70 The Court's actual approach to this case is foreshadowed by its early statement that "we will review the evidence presented to the District Court." (Emphasis added.) The proper approach to reviewing a trial court's findings of fact to determine whether they are clearly erroneous is for this Court to examine the record to ascertain, first, whether substantial evidence supports that court's findings. Here, the Court does not do so; instead, it sets forth at some length the portions of the record upon which it ultimately will make its own determinations about the weight of the evidence. Indeed, the reader would never know from reading the Court's opinion that, after a 9-day bench trial at which nearly two dozen witnesses testified and for which the transcript exceeds 2000 pages, the District Court entered 53 pages of extensive findings of fact and conclusions of law. The

reader also would not know that the specific findings by the District Court which this Court determines are clearly erroneous--namely, Finding No. 24, that MRL and the LRC had an arms-length relationship, and Finding No. 27, that the LRC functioned independently--were premised on extensive earlier findings which resulted from that court's weighing of the evidence and credibility determinations and in which the District Court stated the evidence on which it relied.

¶71 Moreover, the so-called "FACTUAL BACKGROUND" presented in the Court's opinion is--in large part--nothing of the kind. Examples of the non-"facts" included in that portion of the opinion are [293 Mont. 187]entirely speculative phrases by the Court--not by any witnesses in this case--such as "[i]t was undoubtedly because" and "[i]t is perhaps because." In addition, the Court editorializes in its "facts" by such phrases as "it is not surprising."

¶72 In addition, the Court's purported "FACTUAL BACKGROUND" is salted with statements of law which have no relevance or application to this case, such as the definition of "employer" contained in the Railroad Retirement Act. While the Court concedes that the definition is "not identical" to that at issue in this case, the Court attempts to buttress its opinion by the suggestion that the "common consideration of 'control' " contained in the nonapplicable definition is somehow relevant here. A comparison of the definition of control contained in the Railroad Retirement Act with the criteria contained in § 220(2) of the Restatement (Second) of Agency reflects that the "control" elements are, indeed, significantly different. Thus, the Court's inclusion of the opinion rendered by the Deputy General Counsel for the Railroad Retirement Board--in a different proceeding under a different definitional standard--that the LRC "is under common control with

one or more railroad employers" has no bearing here, either legally or factually. Nor is it relevant to this case that the LRC did not appeal that determination or that the Seventh Circuit Court of Appeals affirmed a separate determination appealed by the LRC. Likewise, the Court's ¶ 33, in the so-called "FACTUAL BACKGROUND" section of the opinion, is a statement of the Court's legal opinion that the Railroad Retirement Board's finding that the LRC was under the control of the principals in MRL is "probative of the issue in this case." The statement is not only not "factual," it is incorrect, given the Court's earlier correct statement that Kelley and the Restatement are the applicable law in this case.

¶73 What follows in the Court's opinion is a several-page summary of the evidence it has culled from the 2146-page transcript of the trial in this case. That summary presents only the evidence the Court wishes to recognize, since it is evidence that supports the Court's result. The problem is that the Court excludes massive amounts of other evidence, much of which the District Court relied on in making its 18-page findings of fact, and which support the District Court's findings.

¶74 I cannot agree. I would affirm the District Court's findings and conclusions and I dissent from the Court's failure to do so.

CHIEF JUSTICE TURNAGE joins in the foregoing dissent of JUSTICE GRAY.