650 S.E.2d 119

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Denver A. YOUNGBLOOD, Jr., Defendant Below, Appellant.**

**No. 31765.**

Supreme Court of Appeals of West Virginia.

Submitted: April 17, 2007.

Decided: May 10, 2007.

Dissenting Opinion of Justice Benjamin May 15, 2007.

Concurring Opinion of Justice Starcher June 12, 2007.

Dissenting Opinion of Justice Maynard June 27, 2007.

---

Robert C. Stone, Jr., Martinsburg, for Appellant.

Debra M.H. McLaughlin, Morgan County Prosecuting Attorney, Berkeley Springs, for Appellee.

DAVIS, C.J.

The appellant, Denver A. Youngblood, Jr. (hereinafter Mr. Youngblood), was convicted in the Circuit Court of Morgan County of first degree sexual assault, second degree sexual assault, indecent exposure, two counts of brandishing a weapon, and wanton endangerment with a firearm. The circuit court sentenced Mr. Youngblood to 26 to 60 years imprisonment. The order of conviction and sentence was affirmed by a majority of this Court in *State v. Youngblood,* 217 W.Va. 535, 618 S.E.2d 544 (2005) (Davis, J. and Starcher, J., dissenting). However, the United States Supreme Court granted certiorari in *Youngblood v. West Virginia,* 547 U.S. 867, 126 S.Ct. 2188, 165 L.Ed.2d 269 (2006), vacated the judgment of the majority, and remanded the case for consideration of whether the State's failure to turn over an evidentiary

note violated the disclosure requirement of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). After carefully considering the supplemental briefs and the record submitted on appeal, and listening to the rearguments of the parties, the circuit court's conviction and sentencing order is reversed and this case is remanded for a new trial on all charges.[1]

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

Mr. Youngblood was prosecuted for allegedly forcing Katara N.[2] to perform oral sex on him on two occasions on or about July 28, 2000.[3] The first sexual assault occurred at Mr. Youngblood's home in Berkeley Springs, West Virginia. During this assault three other people were present in the home, but did not witness the alleged assault. The three other individuals were Joe Pitner, Kimberly K.,[4] and Wendy S.[5] When the first sexual encounter ended, Mr. Youngblood and Mr. Pitner left the home. The three young women thereafter went to a nearby house and made a 911 telephone call. It appears that the women told the 911 operator that they were at an unknown location and needed a ride home. After making the telephone call, the three women voluntarily returned to Mr. Youngblood's home.

By the time the women returned to Mr. Youngblood's home, Mr. Youngblood and Mr.

Pitner had returned. All five individuals thereafter got into Mr. Youngblood's car and drove to Mr. Pitner's home, which was also located in Berkeley Springs.[6] While en route to Mr. Pitner's home, Mr. Youngblood's mother was passing by in her vehicle and signaled for him to pull over. Mr. Youngblood's mother approached his car and informed him that she heard on her CB scanner that the police were looking for three women who made a 911 call. As Mr. Youngblood spoke to his mother, two police officers appeared. The officers approached Mr. Youngblood's car. One of the officers, A. Thomas, testified on direct and cross-examination regarding the encounter as follows:

Q. Do you know the individual that was stopped talking to Mr. Youngblood?

A. I believe it was his mother.

Q. So you approached the car?

A. Yes, ma'am.

Q. Was there any other officer with you that night?

A. Yes, ma'am, Officer Barney.

. . . .

Q. And you approached the vehicle?

A. Yes, ma'am.

Q. What did you do?

A. I talked to the driver, which is the Defendant. He had another male passenger on the front passenger side of the car. There was three females in the car. Basically, I has asked if they had come from that area and if they were the callers and

---

1. We wish to make clear that the original opinion filed by this Court resolved six assignments of error. The United States Supreme Court granted certiorari and vacated the judgment of this Court only as to one of the issues, i.e., the allegation of a *Brady* violation. Consequently, the resolution of the remaining five issues in the original opinion was not disturbed and remain the law of the case on remand to the circuit court. *See Santa Barbara County Water Agency v. All Persons and Parties*, 53 Cal.2d 743, 745, 3 Cal. Rptr. 348, 350 P.2d 100 (1960) ("Insofar as the prior opinion of this court affirmed the judgment of the trial court, and passed on the several issues involved other than the validity of the contracts, review was not sought or given by the United States Supreme Court. What was said [on] these issues is the law of the case ... and is reaffirmed, and need not be restated here.").

2. Katara was sixteen years old at the time of the incident, therefore we will follow our practice

and not disclose her last name. *See State v. Steven H.*, 215 W.Va. 505, 507 n. 1, 600 S.E.2d 217, 219 n. 1 (2004).

3. A complete recitation of the facts appear in *State v. Youngblood*, 217 W.Va. 535, 618 S.E.2d 544 (2005), and an abbreviated recitation of the facts are set out in *Youngblood v. West Virginia*, 547 U.S. 867, 126 S.Ct. 2188, 165 L.Ed.2d 269 (2006).

4. Kimberly was fifteen years old at the time.

5. Wendy had just turned eighteen years old at the time.

6. There was evidence during the trial that at some point Katara was allowed to drive Mr. Youngblood's vehicle.

what was going on and if they knew anything about it.

Q. Do you know what their response was?

A. I got the response of, you know, they weren't the ones that called and they didn't know what was going on.

. . . .

Q. You asked the three girls in the back were they the ones that called the police or the ones that needed help?

A. Yes, sir, I did.

Q. And each of them said no?

A. Yes, sir.

Q. And did it appear to you that these girls were scared?

A. Looking back on it, no, not that I remember and that is why we thought that it was not part of what was occurring.

Q. Were they winking at you or trying to give you secret signals?

A. Not that I noticed.

Q. Doing anything to try to signal you?

A. Not that I noticed.

Q. But based upon your recollection everybody appeared to be fine.

A. Yes.

The two officers and Mr. Youngblood's mother left the scene. Thereafter Mr. Youngblood drove to Mr. Pitner's home. While at Mr. Pitner's home it was alleged that Mr. Youngblood once again forced Katara to perform oral sex on him. This encounter was also not witnessed by the other three individuals present in the home. Shortly thereafter the women were driven to Hagerstown, Maryland and left there.

After the three women were dropped off, Katara went home. However, Wendy and Kimberly were taken to a sheriff's office by Wendy's mother.[7] Wendy and Kimberly informed the police that Mr. Youngblood gave them alcohol and carried a gun.[8] After statements were taken from Wendy and Kimberly, the police contacted Katara and

took a statement from her. Subsequent to the investigation Mr. Youngblood was indicted in 2001 on sexual assault and other charges involving Katara, and on weapon charges involving Wendy and Kimberly. A jury convicted Mr. Youngblood of all charges and he was sentenced accordingly by the trial court.[9]

Subsequent to his conviction and sentence, Mr. Youngblood filed a motion for a new trial based upon newly discovered evidence. The evidence in question was a note that was found at the home where Mr. Pitner resided. The note was found by the owner of the home, Patricia Miles.[10] The trial court held an evidentiary hearing on the motion. At that hearing Ms. Miles informed the court that the officer who investigated the case against Mr. Youngblood read the note and told her to throw it away. As discussed more fully in this opinion, the note contained language that could reasonably be interpreted as showing that Mr. Youngblood engaged in consensual sex with Katara-which was his defense at trial. The trial court ultimately denied the motion for a new trial on the grounds that the note only had impeachment value and that the investigating officer's knowledge of the note could not be imputed to the prosecutor.

In Mr. Youngblood's initial appeal to this Court, the majority of the Court found that the trial judge was correct in denying his motion for new trial based upon newly discovered evidence. The majority opinion did not address the issue in the context of a *Brady* violation. Subsequently, the United States Supreme Court granted certiorari, vacated the judgment and remanded the case for consideration of the *Brady* issue.

## II.

### DUTY ON REMAND AND STANDARD OF REVIEW

This case is once again before this Court, as a result of the United States Supreme Court granting certiorari, vacating the judg-

---

7. At the time that Wendy and Kimberly went to the sheriff's office, State Trooper A.T. Peer was present. As pointed out later in this opinion, Trooper Peer took over the investigation.

8. Allegations were also made against Mr. Pitner.

9. The original opinion filed by this Court indicated that Mr. Youngblood was indicted on seven counts, but the grand jury actually returned a six count indictment against him.

10. Ms. Miles is Mr. Pitner's aunt.

ment of the majority, and remanding the case.[11] The mandate issued by the United States Supreme Court stated that "the case is remanded to the Supreme Court of Appeals of West Virginia for further proceedings not inconsistent with the opinion of this Court." The essence of the opinion issued by the United States Supreme Court is as follows:

> The trial court denied Youngblood a new trial, saying that the note provided only impeachment, but not exculpatory, evidence. The trial court did not discuss *Brady* or its scope, but expressed the view that the investigating trooper had attached no importance to the note, and because he had failed to give it to the prosecutor the State could not now be faulted for failing to share it with Youngblood's counsel.
>
> A bare majority of the Supreme Court of Appeals of West Virginia affirmed, finding no abuse of discretion on the part of the trial court, but without examining the specific constitutional claims associated with the alleged suppression of favorable evidence. Justice Davis, dissenting in an opinion that Justice Starcher joined, unambiguously characterized the trooper's instruction to discard the new evidence as a *Brady* violation. The dissenters concluded that the note indicating that Youngblood engaged in consensual sex with Katara had been suppressed and was material, both because it was at odds with the testimony provided by the State's three chief witnesses (Katara, Kimberly, and Wendy) and also because it was entirely consistent with Youngblood's defense at trial that his sexual encounters with Katara were consensual.
>
> . . . .
>
> Youngblood clearly presented a federal constitutional *Brady* claim to the State Supreme Court, as he had to the trial court. And, as noted, the dissenting justices discerned the significance of the issue raised. If this Court is to reach the merits of this case, it would be better to have the benefit of the views of the full Supreme Court of Appeals of West Virginia on the *Brady* issue. We, therefore, grant the petition for certiorari, vacate the judgment of the State Supreme Court, and remand the case for further proceedings not inconsistent with this opinion.

*Youngblood*, 126 S.Ct. at 2189–2190 (internal citations omitted).

In view of the opinion issued by the United States Supreme Court, we believe that three issues must be resolved: (1) whether the prosecution's disclosure duty under *Brady* includes evidence that is known only to police investigators, (2) whether the disclosure requirement under *Brady* includes disclosure of favorable impeachment evidence, and (3) whether the suppressed evidence violated the disclosure requirement of *Brady*. In resolving these three issues we do not believe that this Court is precluded from also considering the issues on independent State constitutional grounds under our decision in *State v. Hatfield*, 169 W.Va. 191, 286 S.E.2d 402 (1982). This is particularly so because in Mr. Youngblood's original brief and supplemental brief he argued both State and federal constitutional grounds for a new trial. *See State v. Hershberger*, 462 N.W.2d 393, 396–397 (Minn.1990) ("It is unnecessary to rest our decision on the [federal case that the United States Supreme Court asked us to consider on remand,] when the Minnesota Constitution alone provides an independent and adequate state constitutional basis on which to decide."); *Pelliccioni v. Schuyler Packing Co.*, 140 N.J.Super. 190, 356 A.2d 4, 6 (1976)

---

**11.** This disposition by the United States Supreme Court was through an order that is known as a "GVR" order. This type of disposition has been addressed as follows:

> Where intervening developments, or recent developments that we have reason to believe the court below did not fully consider, reveal a reasonable probability that the decision below rests upon a premise that the lower court would reject if given the opportunity for further consideration, and where it appears that such a redetermination may determine the ulti-

mate outcome of the litigation, a GVR order is, we believe, potentially appropriate.
*Lawrence on Behalf of Lawrence v. Chater*, 516 U.S. 163, 167, 116 S.Ct. 604, 607, 133 L.Ed.2d 545 (1996). It has been suggested that "such an order indicate[s], as a prima facie matter, that the judgment below is in error, but that the lower court remains free to reach whatever result it feels appropriate." Shaun P. Martin, "Gaming the GVR," 36 Ariz. St. L.J. 551, 564–565 (2004) (internal quotation marks omitted).

("[S]tate courts, after a United States Supreme Court remand, are free to alter—subject only to the state's jurisprudence—prior decisions in the case on state law so long as the altered decision is consistent with the federal Supreme Court's ruling on the federal question presented and remanded."); *Immuno AG. v. Moor–Jankowski*, 77 N.Y.2d 235, 251–252, 566 N.Y.S.2d 906, 567 N.E.2d 1270 (1991) ("The [United States] Supreme Court has specifically directed us to consider the case in light of *Milkovich [v. Lorain Journal Co.*, 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990)], and we comply with that direction, as courts throughout the Nation have done in similar circumstances. But that does not compel us to ignore our prior decision or the arguments fully presented on remand that provide an alternative basis for resolving the case.").

█ Our review of the three issues will be in the context of the trial court's ruling denying Mr. Youngblood's post-trial motion for a new trial based upon a violation of *Brady* and *Hatfield*. As a general matter we have held that "[a] trial court's order denying a defendant's motion for a new trial is entitled to substantial deference on appeal." *State v. Cooper*, 217 W.Va. 613, 616, 619 S.E.2d 126, 129 (2005). A claim of a violation of *Brady* and *Hatfield* presents mixed questions of law and fact. Consequently, the "circuit court's factual findings should be reviewed under a clearly erroneous standard and . . . questions of law are subject to *de novo* review." *State v. Kearns*, 210 W.Va. 167, 168–169, 556 S.E.2d 812, 813–814 (2001). *Accord United States v. Risha*, 445 F.3d 298, 303 (3rd Cir. 2006); *United States v. Jernigan*, 451 F.3d 1027, 1030 (9th Cir.2006); *United States v. Martin*, 431 F.3d 846, 850 (5th Cir.2005); *United States v. Schlei*, 122 F.3d 944, 989 (11th Cir.1997); *United States v. Hughes*, 33 F.3d 1248, 1251 (10th Cir.1994); *United States v. Rivalta*, 925 F.2d 596, 598 (2nd Cir.1991).

## III.

## DISCUSSION

### A. *Knowledge of Evidence by the Police is Imputed to the Prosecutor*

█ In criminal proceedings the State is obligated to turn over documents and other matters in its possession, custody or control, if requested by a defendant pursuant to Rule 16 of the West Virginia Rules of Criminal Procedure. The record in this case discloses that Mr. Youngblood invoked Rule 16 and requested the State turn over and permit him to copy "all books, papers, [and] documents . . . which are within the possession, custody and control of the State, and which are material to the preparation of his . . . defense[.]" There is no dispute in this case that, notwithstanding Mr. Youngblood's discovery request, the State failed to turn over the note that was found at Ms. Miles' home. The State argues, and the trial court so ruled, that insofar as the police had knowledge of the note, such knowledge could not be imputed to the State for disclosure purposes under *Brady* and *Hatfield*. We disagree.

It is not relevant under *Brady* and *Hatfield* that the police, rather than a prosecutor, had knowledge of material evidence that was favorable to a defendant. The United States Supreme Court addressed this point in *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995):

[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police. But whether the prosecutor succeeds or fails in meeting this obligation, the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable.

The State of Louisiana [in this case] would prefer . . . [a] more lenient rule. It pleads that some of the favorable evidence in issue here was not disclosed even to the prosecutor until after trial, and it suggested . . . that it should not be held accountable under . . . *Brady* for evidence known only to police investigators and not to the prosecutor. To accommodate the State in this manner would, however, amount to a serious change of course from the *Brady* line of cases. In the State's favor it may be said that no one doubts that police investigators sometimes fail to inform a

prosecutor of all they know. But neither is there any serious doubt that procedures and regulations can be established to carry [the prosecutor's] burden and to insure communication of all relevant information on each case to every lawyer who deals with it. Since, then, the prosecutor has the means to discharge the government's *Brady* responsibility if he will, any argument for excusing a prosecutor from disclosing what he does not happen to know about boils down to a plea to substitute the police for the prosecutor, and even for the courts themselves, as the final arbiters of the government's obligation to ensure fair trials.

*Kyles*, 514 U.S. 419 at 437–38, 115 S.Ct. 1555, at 1567–68, 131 L.Ed.2d 490 (internal quotations and citations omitted).[12] The decision in *Kyles* stands for the proposition that "it is proper to impute to the prosecutor's office facts that are known to the police and other members of the investigation team." *United States v. Wilson*, 237 F.3d 827, 832 (7th Cir.2001). *See also Powell v. United States*, 880 A.2d 248, 254 (D.C.2005) ("The government also concedes that the prosecutor's lack of actual knowledge, and therefore any bad faith, is not relevant to the *Brady* analysis. As the government points out in its brief, the MPD and the FBI were part of the government team and their knowledge is imputed to the prosecutors."). *Archer v. State*, 934 So.2d 1187, 1203 (Fla.2006) ("To comply with *Brady,* the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case and to disclose that evidence if it is material."); *Harrington v. State*, 659 N.W.2d 509, 522 (Iowa 2003) ("This test does not mean, however, that evidence unknown to the individual prosecutor is not considered suppressed ... Regardless of whether the prosecutor actually learns of the favorable evidence, the prosecution bears the responsibility for its disclosure."); *State v. Jones*, 891 So.2d 760, 775 (La.Ct.App.2004) ("[T]he State is not necessarily absolved of its responsibilities under *Brady* simply because the prose-

cution does not possess or have knowledge of evidence, because the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."); *Thomas v. State*, 131 P.3d 348, 353 (Wyo.2006) ("We have applied *Brady* to hold that the duty to disclose exculpatory evidence ... encompasses evidence known only to police investigators and not to the prosecution."); In the final analysis, "[t]he prosecutor cannot get around *Brady* by keeping [him]/herself in ignorance." *United States v. Hamilton*, 107 F.3d 499, 509 (7th Cir.1997);

In view of the foregoing we hold that a police investigator's knowledge of evidence in a criminal case is imputed to the prosecutor. Therefore, a prosecutor's disclosure duty under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *State v. Hatfield*, 169 W.Va. 191, 286 S.E.2d 402 (1982), includes disclosure of evidence that is known only to a police investigator and not to the prosecutor. To the extent that the trial court found that the investigating police officer's knowledge of the note could not be imputed to the prosecutor, such ruling was error.

## B. The State's Duty to Disclose Favorable Impeachment Evidence

■ During Mr. Youngblood's post-trial hearing for a new trial, the circuit court ruled that failure to disclose the note prior to trial was harmless, because it had only impeachment value. In other words, the circuit court took the position that if the State possesses material evidence which could be used by the defendant only for impeachment purposes, the State is under no obligation to turn over the evidence. We believe the circuit court's ruling is inconsistent with the due process requirements of both the federal and state constitutions.

■ To begin, the United States Supreme Court held in *Brady* that "the suppression by the prosecution of evidence favorable to an

---

**12.** *See* 1 Franklin D. Cleckley, *Handbook on West Virginia Criminal Procedure* 302 (2d ed. Supp. 2006) ("A prosecutor's *Brady* disclosure duty ... includes material that is known only to police investigators and not to [the] prosecutor; an individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf.")

accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1196–97.[13] The requirement under *Brady* that evidence must be requested by a defendant was later modified in *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), where it was said that "there are situations in which evidence is obviously of such substantial value to the defense that elementary fairness requires it to be disclosed even without a specific request." *Agurs,* 427 U.S. at 110, 96 S.Ct. at 2401.

Although "*Brady* addressed only exculpatory evidence, this doctrine has been expanded to include impeachment evidence as well as exculpatory evidence." *Thompson v. Cain,* 161 F.3d 802, 806 (5th Cir.1998). The United States Supreme Court has expressly "disavowed any difference between exculpatory and impeachment evidence for *Brady* purposes[.]" *Kyles v. Whitley,* 514 U.S. 419, 433, 115 S.Ct. 1555, 1565, 131 L.Ed.2d 490 (1995). *See also United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985) ("Impeachment evidence, however, as well as exculpatory evidence, falls within the *Brady* rule. Such evidence is 'evidence favorable to an accused,' so that, if disclosed and used effectively, it may make the difference between conviction and acquittal."). In sum, the essential elements of a *Brady* violation have been stated as follows:

There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is

impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.

*Strickler v. Greene,* 527 U.S. 263, 281–282, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999).

"This Court has incorporated into West Virginia jurisprudence the principles set forth in *Brady* and *Agurs.*" *State v. Salmons,* 203 W.Va. 561, 572, 509 S.E.2d 842, 853 (1998). We initially adopted *Brady* as part of our State constitutional due process in syllabus point 4 of *State v. McArdle,* 156 W.Va. 409, 194 S.E.2d 174 (1973), where it was held that "[a] prosecution that withholds evidence on the demand of an accused, which, if made available would tend to exculpate him, violates due process of law." *McArdle* was modified in *State v. Hatfield,* 169 W.Va. 191, 286 S.E.2d 402 (1982), in response to *Agurs,* for the purpose of removing the requirement that material exculpatory evidence had to be requested. It was said in syllabus point 4 of *Hatfield* that "[a] prosecution that withholds evidence which if made available would tend to exculpate an accused by creating a reasonable doubt as to his guilt violates due process of law under Article III, Section 14 of the West Virginia Constitution."

■ As to the issue of disclosure of impeachment evidence, this Court has reversed several convictions on the basis of the State's failure to disclose favorable impeachment evidence. *See State v. Kearns,* 210 W.Va. 167, 556 S.E.2d 812 (2001); *State ex rel. Yeager v. Trent,* 203 W.Va. 716, 510 S.E.2d 790 (1998); *State v. Hoard,* 180 W.Va. 111, 375 S.E.2d 582 (1988); *State v. Hall,* 174 W.Va. 787, 329

---

**13.** A "bad faith" showing is necessary when a *Brady* violation involves "the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Arizona v. Youngblood,* 488 U.S. 51, 57, 109 S.Ct. 333, 337, 102 L.Ed.2d 281 (1988). The facts in the instant case do not implicate the facts underpinning *Arizona v. Youngblood. See* Syl. pt. 2, *State v. Osakalumi,* 194 W.Va. 758, 461 S.E.2d 504 (1995) ("When the State had or should have had evidence requested by a criminal defendant but the evidence no longer exists when the defendant seeks its production, a trial court must determine (1) whether the requested material, if in the possession of the State at the time of the defen-

dant's request for it, would have been subject to disclosure under either West Virginia Rule of Criminal Procedure 16 or case law; (2) whether the State had a duty to preserve the material; and (3) if the State did have a duty to preserve the material, whether the duty was breached and what consequences should flow from the breach. In determining what consequences should flow from the State's breach of its duty to preserve evidence, a trial court should consider (1) the degree of negligence or bad faith involved; (2) the importance of the missing evidence considering the probative value and reliability of secondary or substitute evidence that remains available; and (3) the sufficiency of the other evidence produced at the trial to sustain the conviction.").

S.E.2d 860 (1985).[14] However, we have never formally recognized this issue under the due process clause of our State constitution. We do so today and hold that there are three components of a constitutional due process violation under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *State v. Hatfield*, 169 W.Va. 191, 286 S.E.2d 402 (1982):(1) the evidence at issue must be favorable to the defendant as exculpatory or impeachment evidence; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must have been material, *i.e.*, it must have prejudiced the defense at trial.[15]

Having determined that favorable impeachment evidence is a component of *Brady*

and *Hatfield*, it is clear that the trial court committed error in finding that failure to disclose the note was irrelevant because it merely had impeachment value.

### C. Application of Brady and Hatfield

█ At this stage of our analysis we will now apply each of the elements of *Brady* and *Hatfield* to the facts of this case to determine whether Mr. Youngblood is entitled to a new trial.[16]

**(1). The evidence was favorable impeachment evidence.[17]** The first element under *Brady* and *Hatfield* that we must consider is whether the note provided favorable impeachment evidence for Mr. Youngblood.[18]

14. *See also Salmons*, 203 W.Va. at 573, 509 S.E.2d at 854 ("In a third landmark case, *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), the United States Supreme Court held that there was no difference between exculpatory and impeachment evidence for Brady purposes."); 1 Cleckley, *West Virginia Criminal Procedure* 756 ("In addition to purely exculpatory evidence, a defendant is entitled, upon request, to disclosure of information that might be used to impeach government witnesses.").

15. We should point out that in the original opinion in this case the majority incorrectly applied a principle of law concerning nonsuppressed newly discovered evidence. That principle of law states that a "new trial will generally be refused when the sole object of the new evidence is to discredit or impeach a witness on the opposite side." Syl. pt. 1, *State v. Crouch*, 191 W.Va. 272, 445 S.E.2d 213 (1994). The *Crouch* standard has no application in the context of the constitutionally required disclosure under *Brady* and *Hatfield*. *See State v. Frazier*, 162 W.Va. 935, 942 n. 5, 253 S.E.2d 534, 538 n. 5 (1979) ("The newly discovered evidence rule contained in [*Crouch* ] will not apply where the State has suppressed exculpatory material."). "We have repeatedly recognized ... the distinction between the disclosure of ... evidence, which is constitutionally mandated under *Brady* and its progeny, and the production of evidence pursuant to a court order implementing discovery." *State v. Fortner*, 182 W.Va. 345, 353 n. 5, 387 S.E.2d 812, 820 n. 5 (1989). In other words, newly discovered impeachment evidence that was suppressed within the meaning of *Brady* and *Hatfield* can form the basis of a new trial; whereas newly discovered impeachment evidence that was not suppressed within the meaning of *Brady* and *Hatfield* generally cannot form the basis of a new trial. *See State v. Stewart*, 161 W.Va. 127, 239 S.E.2d 777 (1977) (carving out exception to general rule that nonsuppressed

newly discovered impeachment evidence cannot form the basis of a new trial).

16. Our analysis of the impeachment evidence is in the context of the sexual assault charges and not the weapon related charges. However, because all of the charges were factually intertwined our resolution of the *Brady* and *Hatfield* issue impacts the disposition of all of the charges. As noted in the original majority opinion, the circuit court denied Mr. Youngblood's pretrial motion to sever charges because the court "viewed all of the charges as interrelated and as parts of the whole picture of the case." *Youngblood*, 217 W.Va. at 542 n. 7, 618 S.E.2d at 551 n. 7.

17. We limit our analysis to the issue of impeachment evidence, as opposed to exculpatory evidence, because that was the basis for the trial court's ruling. However, "[w]e have recognized that evidence reflecting on the credibility of a key prosecution witness may be so material to the issue of guilt as to qualify as exculpatory matter which the prosecution is constitutionally required to disclose under *Hatfield*." *State v. Fortner*, 182 W.Va. 345, 354, 387 S.E.2d 812, 821 (1989).

18. Professor Cleckley has noted that there is a split of authority among federal courts as to whether or not evidence must be admissible to come under the requirements of *Brady:*

[S]ome courts have held that the prosecutor's duty to disclose is limited to information which would be admissible as evidence. Other courts have held that the crucial question is whether the material would be likely to lead to admissible evidence as an end-product; if so, the prosecutor has a duty to disclose.

1 Cleckley, *West Virginia Criminal Procedure* 757. Under this Court's prior case law the note was admissible for purposes of impeaching its author. We have held that "[p]rior inconsistent

See Syl. pt. 4, *State v. Bolling*, 162 W.Va. 103, 246 S.E.2d 631 (1978) ("Before prosecutorial error can occur under the doctrine of suppression of evidence, it must be shown that the evidence suppressed would be relevant to an issue at the criminal trial."). We believe it does.

During the trial Katara testified that Mr. Youngblood forced her to perform oral sex on him on two occasions. There was no evidence that Mr. Youngblood performed a sexual act on Katara. During the testimony of Kimberly and Wendy they both stated that Katara never informed them of any sexual act occurring between Mr. Youngblood and herself. The note that was found at Ms. Miles' home was inconsistent with the testimony of either Kimberly or Wendy.[19] The note, addressed to Mr. Pitner, stated the following:

This is for Joe! Only!

IMPORTANT

You can read it if you want!

How do you like what we did to your house!

You just got played!

In the long Run, you was the one who got f* * * * *!

Throw everything away in your medicine cabinet!

Milk does a body good with TIDE!

F* * * you a* *holes!!!!!

I hope they kick you out

Katara said Thanks for eating her p* * * * Denver [Mr. Youngblood]

Hope you love the pictures

Clean the microwave

I Brushed my a* * with all of yall's tooth Brushes!

Don't eat the ice cream because it has my p* * * * smell all in it!

Don't ever talk sh* * about me because pay backs are a b* * * *!!!

You smoked my boogers B* * * *!

(Emphasis added).

Clearly this note suggests that Katara told Kimberly or Wendy that Mr. Youngblood performed oral sex on her-and that she was grateful for this. Mr. Youngblood could have used this evidence during the trial not only to impeach Kimberly or Wendy, but to also explore a variety of questioning that logically flows from the statement allegedly made by Katara to Kimberly or Wendy.[20] Consequently, the note was favorable impeachment evidence to Mr. Youngblood. *See United States v. Arnold*, 117 F.3d 1308, 1317 (11th Cir.1997) ("An analysis of the taped conversations provides favorable evidence to the defense, in terms of impeachment evidence and contradictions of the trial testimony of the government's key witness.").

■ (2) **The evidence was suppressed by the State.** We have already determined that evidentiary knowledge by the police is imputed to the State. Consequently, the facts of this case clearly show that the State sup-

---

statements of prosecution witnesses in a criminal case are admissible for impeachment purposes without the need to lay any particular foundation for their admission." Syl. pt. 5, *State v. Sette*, 161 W.Va. 384, 242 S.E.2d 464 (1978). *See also State v. Hall*, 174 W.Va. 787, 791, 329 S.E.2d 860, 864 (1985) ("Impeachment of a witness can occur by several methods. One is through cross-examination on a prior inconsistent statement. Another technique is to offer a witness whose testimony is inconsistent with the first witness's.").

19. Because this writing was suppressed by the State, Mr. Youngblood has not had an opportunity to determine, through a handwriting expert or an admission, which girl wrote the note. During the post-trial hearing counsel for Mr. Youngblood asked for "leave of Court to get a handwriting expert to analyze this in conjunction with

the statements that were given by [Kimberly and Wendy] so we can confirm, yes, it is indeed their handwriting." The trial court denied the request.

20. Of course, it is of no moment that the impeachment may only be of one of the two witnesses. The United States Supreme Court has made clear that "the effective impeachment of one eyewitness can call for a new trial even though the attack does not extend directly to others[.]" *Kyles*, 514 U.S. at 445, 115 S.Ct. at 1571. *See also Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959) ("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.").

pressed the note by abandoning it and attempting to have it destroyed.[21]

During the investigation into the charges against Mr. Youngblood, Trooper A.T. Peer went to the home of Ms. Miles. Trooper Peer had a search warrant and informed Ms. Miles that he needed to search her house for evidence pertaining to the charges against Mr. Youngblood.[22] After Trooper Peer concluded his search he left the home. Two days later Ms. Miles discovered that some of her food and household items had been tampered with during that time that Mr. Youngblood and the others were at her home. Ms. Miles stated that she also found the note in her telephone notebook. After Ms. Miles read the note she called Trooper Peer. Subsequently Trooper Peer came back to Ms. Miles' home. Ms. Miles gave the following testimony regarding Trooper Peer and the note:

Q. Is that the note that you presented to Trooper Peer when he came to your house?

A. Yes, it is.

Q. On the second time?

A. Yes, it is.

Q. Did you actually give it to him or let him look?

A. I gave him the notebook. It was in the notebook, it wasn't like this, it was in the notebook. I actually gave it to him and he read it and he said just throw everything away. I said, just throw everything away. My nephew, Joe Pitner, was incarcerated and I kept the note, I never threw the notebook way with this paper, I put it underneath my cabinet.

Ms. Miles' testimony about Trooper Peer's review of the note and instructions to throw it away were corroborated by her daughter, who was present at the time:

Q. Do you have any idea whether or not Trooper Peer read that note?

A. Yes, I do.

Q. You know?

A. I was standing there when he read it.

Q. Okay. He read it out loud?

A. No, he didn't, he read it to himself.

. . . .

Q. Was there discussion about throwing things away or throwing articles away?

A. He told her just to go ahead and throw the milk away and throw the notebook away.

Q. Do you recall hearing that?

A. Yes.

During Trooper Peer's post-trial testimony he did not deny reading the note, nor instructing Ms. Miles to throw it away. Instead, Trooper Peer alleged that he had no recollection of the incident.[23] Contrary to the State's position, neither *Brady* nor *Hatfield* yield to a claim of failed recollection. The uncontradicted recollection of events by Ms. Miles and her daughter provide the type of testimony that *Brady* and *Hatfield* must yield to.

The testimony of Ms. Miles and her daughter inform this Court that the State was in possession of the note and ordered that it be

---

**21.** We will note that evidence is considered suppressed when "the existence of the evidence was known, or reasonably should have been known, to the government, the evidence was not otherwise available to the defendant through the exercise of reasonable diligence, and the government either willfully or inadvertently withheld the evidence until it was too late for the defense to make use of it." *United States v. Knight*, 342 F.3d 697, 705 (7th Cir.2003). Under the facts of this case we do not believe that, through the exercise of reasonable diligence, Mr. Youngblood would have uncovered the note prior to trial.

**22.** Trooper Peer was specifically searching for semen that Katara stated she spat out in a trash can at the residence.

**23.** The State has attempted to characterize Trooper Peer's second visit as a new investigation regarding a complaint of vandalism. We do not interpret Ms. Miles' testimony as indicating she called Trooper Peer to report a vandalism incident. Ms. Miles' testimony clearly indicates that she was not moved to call Trooper Peer until after she discovered the note. Insofar as the note also had her nephew's name on it, Mr. Pitner, she was concerned about the note being relevant to charges that were pending against Mr. Pitner. In fact, in testifying as to what she did with the note after Trooper Peer told her to destroy it, Ms. Miles stated that "I put it underneath the cupboard to show my nephew when he got out of jail[."]

destroyed. We are deeply troubled by the State's conduct in this matter. This issue is not a fleeting matter of possible inadvertence. The record in this case shows that Trooper Peer personally obtained the search warrant, specifically seeking evidence of the alleged sexual assault. The record also clearly shows that when Trooper Peer obtained the search warrant he knew the name of the complaining witness, Katara, and the defendant, Mr. Youngblood. Thus, when Trooper Peer returned to Ms. Miles' home and read the note containing the first name of Katara and Mr. Youngblood, and a reference to sexual conduct between the two, we must, in the absence of any rebuttable evidence, presume that he knew the note was evidence involved with his investigation.[24] Consequently, we believe the evidence supports finding that the State suppressed the note by failing to keep it and ordering its destruction.

**(3) The evidence was material.** Our final inquiry is whether or not the suppressed note was material to Mr. Youngblood's defense.[25] That is, was the defense prejudiced by the failure to disclose the note. The State argues that the note was not material and could not have changed the outcome of the trial in any way. We disagree.

■■■ This Court has recognized, along with the United States Supreme Court, that " '[t]he evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome.' " *State v. Fortner,* 182 W.Va. 345, 353, 387 S.E.2d 812, 820 (1989) (quoting *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985)). Additionally, it has been said that "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Kyles,* 514 U.S. at 434, 115 S.Ct. at 1565. All that is

required is a "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435, 115 S.Ct. at 1566. Finally, the suppressed evidence "must be evaluated in the context of the entire record." *Agurs,* 427 U.S. at 112, 96 S.Ct. at 2402.

In this case the record shows that Mr. Youngblood drove Katara and the other passengers to two different residences. At the first residence, Mr. Youngblood's home, Katara alleged that he forced her to perform oral sex on him. Immediately after this incident Mr. Youngblood and Mr. Pitner left the residence. Although Mr. Youngblood and Mr. Pitner were gone, Katara allegedly did not inform Wendy or Kimberly that she was forced to engage in sexual conduct with Mr. Youngblood. Further, all three women left the residence and went to a nearby house and called 911 to seek assistance in getting home. No mention was made to the 911 operator, nor the owner of the home, that Katara was forced to perform a sex act on Mr. Youngblood. All three women returned to Mr. Youngblood's home. Thereafter Mr. Youngblood and Mr. Pitner returned and all five individuals drove off together en route to Mr. Pitner's home. While driving to Mr. Pitner's home, Mr. Youngblood's mother stopped him and engaged in a brief conversation. At no time during this incident did Katara state that she was the victim of sexual assault. Further, two police officers arrived on the scene in response to the 911 call. Katara and the other two women denied having called 911. More importantly, Katara never informed the police that she was forced to engage in a sexual act with Mr. Youngblood. Eventually all five individuals ended up at Mr. Pitner's home. While at the residence Mr. Youngblood again allegedly forced Katara to perform oral sex on him. Subsequently, the women were taken to and abandoned in Hagerstown. Immediately after being dropped off at Hagerstown, Katara left without telling Wendy or Kimberly that she

---

**24.** It is obvious that Ms. Miles, who was not a trained police officer, believed the note was significant to the investigation and therefore did not throw it away as ordered by Trooper Peer.

**25.** Mr. Youngblood did not testify at trial nor did he call any witnesses. He presented his defense through cross examination of witnesses called by the State.

was the victim of a sexual assault. The police became involved after Wendy's mother took her and Kimberly to a sheriff's office to complain that Mr. Youngblood gave the two women alcohol and that he had a gun. Insofar as Katara was also with the women during this incident, the police contacted her. It was during the investigation of the complaint of contributing to the delinquency of a minor that Katara first mentioned that she was the victim of a sexual assault.

The above facts must be considered along with the following key points. Mr. Youngblood's defense to the sexual assault charges was that he and Katara engaged in consensual sex.[26] Katara testified at trial that Mr. Youngblood forced her to perform oral sex on him twice. Katara failed to testify that oral sex was performed on her. Katara testified that she did not inform Wendy nor Kimberly about the forced sex. Both Wendy and Kimberly testified that Katara did not inform them that she was sexually assaulted.

■ For the purposes of this opinion, the note contains three critical pieces of evidence that the jury did not hear.[27] First, the note clearly suggests that Katara informed either Wendy or Kimberly that she engaged in sexual conduct with Mr. Youngblood, which would be inconsistent with Wendy or Kimberly's testimony and the testimony of Katara. Second, contrary to Katara's testimony, the note suggests that Mr. Youngblood performed oral sex on her. Finally, the note suggests that Katara was pleased with the

oral sex performed on her, i.e., that the sexual conduct was consensual.[28] Insofar as the note was suppressed, the jury was never able to assess the credibility of each of the State's three key witnesses, through effective questioning that would have naturally flowed from the introduction of the note through its author. This is particularly crucial because the State's case was weak, in light of evidence showing that Katara had an opportunity to flee and protect herself after the first alleged sexual assault when she went to a nearby house, and when two police officers stopped and spoke with her. In view of all the evidence in the case, we believe that there is a reasonable probability that, had the note been disclosed to the defense, the result of this proceeding would have been different.[29] *See State v. Kearns*, 210 W.Va. 167, 169, 556 S.E.2d 812, 814 (2001) ("In view of the clear contradictory nature of the non-disclosed statement and [the] potential impact of its revelation to the jury ... on the assessment of the credibility of the [victim's] testimony, this Court believes that the State's withholding of the statement did violate the appellant's constitutional rights[.]"); *State v. Hall*, 174 W.Va. 787, 791, 329 S.E.2d 860, 863 (1985) ("Viewing the record as a whole, we conclude that the jury's verdict might have been different had the jury been allowed to hear Green's prior inconsistent statement."). Therefore, we find that the State's failure to turn over the note violated *Brady* and *Hatfield*.[30] Thus, the trial court

---

**26.** During Mr. Youngblood's initial interview with the police he denied having any sexual contact with Katara. However, for purposes of the trial, his defense was that the sexual conduct was consensual. Mr. Youngblood's counsel informed the jury during closing arguments that:

> You have got to determine was this consensual. You need to determine based upon Katara['s] actions, how she behaved that night, as described by herself and her friends, as to whether or not this seemed to be someone exhibiting signs of being subject to this act of forced oral sex with a gun pointed at her head[.]

**27.** We do not intend to import any validity to contents of the note, that is an issue that must be litigated during the retrial.

**28.** Although we have pointed out three issues that flow from the note, there are other ways in which this note could be used. However,

it would be improper for this Court to set out a laundry list of potential ways in which the note may be used.

**29.** It has been held "that once *Brady* error is found to be material, further harmless error review is unnecessary[.]" *United States v. Ellis*, 121 F.3d 908, 916 (4th Cir.1997). *See also Salmons*, 203 W.Va. at 573, 509 S.E.2d at 854 ("[O]nce a reviewing court applying [*Brady*] has found constitutional error there is no need for further harmless-error review.").

**30.** We wish to make clear that our standard under *Hatfield* may be higher than *Brady*. That is, "[d]isposition of [Mr. Youngblood's] federal due process rights, under [*Brady*], does not necessarily resolve his right of due process under [*Hatfield*]." *State v. Osakalumi*, 194 W.Va. 758, 765, 461 S.E.2d 504, 511 (1995). Therefore, should the United States Supreme Court grant

erred in denying Mr. Youngblood's motion for a new trial.

## IV.

## CONCLUSION

The circuit court's order convicting and sentencing Mr. Youngblood is reversed and this case is remanded for a new trial on all charges.

Reversed and Remanded.

BENJAMIN, Justice, dissenting:

(Filed May 15, 2007)

The Majority opinion attempts to sanitize Youngblood, hide his weapon and provide him with a script to follow for cross-examination at his newly-awarded trial—all upon the misguided premise that the citizens of Morgan County who served on the jury below might have found Youngblood innocent of two sexual assaults, indecent exposure, brandishing and wanton endangerment with a handgun if only the defense had access to a note the provenance and accuracy of which is highly questionable.[1] This authorship of this note, which the Majority contends is *important* impeachment evidence, is not known. And while the Majority apparently believes that *someone* is subject to impeachment by

this note, it is undisputed that Katara N., the victim of Youngblood's sexual assaults, is not subject to that impeachment since even this Court and the Supreme Court of the United States agree that this sixteen year old victim was not the note's author. Since neither *Brady* nor *Hatfield* are dispositive in this case, and since the Majority's characterization of this issue as one of constitutional magnitude cannot serve, under federal or state law, to imbue the note with a legal significance it simply does not have, I dissent. The ordinary standard relating to after-acquired evidence is instead applicable in this case, and the circuit court, having heard the testimony, acted appropriately.

The State's factual case was compelling. It was easily enough for the jury to have convicted Youngblood for his crimes regardless of the note. With respect to the sexual assault charges, the State's case was established by the sixteen year old victim's testimony which was completely consistent with the physical evidence recovered at the scene of the crime. While Youngblood did not testify at trial, a voluntary statement he gave to investigators was introduced *without objection*. This statement was devastating to Youngblood in that it established that Youngblood affirmatively lied to investigators about

certiorari again and find that the failure to disclose the note did not violate *Brady*, we wish to make clear that we unequivocally find that *Hatfield* has been violated. "This Court has ... held that '[t]he provisions of the Constitution of the State of West Virginia may, in certain instances, require higher standards of protection than afforded by the Federal Constitution.'" *State v. Mullens*, 221 W.Va. 70, 90, 650 S.E.2d 169, 188, 2006 WL 4099850 (No. 33073 February 28, 2007) (quoting Syl. pt. 2, *Pauley v. Kelly*, 162 W.Va. 672, 255 S.E.2d 859 (1979)). This is to say "'that West Virginia is free to adopt protections of its own, so long as West Virginia does not diminish federal rights.'" *State v. Flippo*, 212 W.Va. 560, 580 n. 25, 575 S.E.2d 170, 190 n. 25 (2002) (quoting *State v. Carrico*, 189 W.Va. 40, 44, 427 S.E.2d 474, 478 (1993)).

1. Perhaps, instead of rushing to set aside Youngblood's convictions on a document which may fail evidentiary authentication, this Court should have instead adopted the more sensible approach of directing the circuit court to order a provisional or interim analysis of the note to determine the author or authors and, following a hearing,

to enter findings of fact. It cannot be said today *as a matter of law* that the note is not a forgery created to discredit the complaining witnesses, especially since the note was not found during the initial search. Without a definitive analysis of the note or at least some effort to obtain one, it is apparent that the Majority goes too far in impulsively and precipitously vacating multiple verdicts upon its own speculation, surmise and conjecture.

Suppose Kimberly K. is called as a witness in the upcoming trial and during the course of her testimony denies any knowledge of the note, which included an admission to multiple acts of vandalism of the Pitner residence? Next, Wendy S. is called to the stand and during her testimony also denies any knowledge of the note. That possibility is not addressed by the Majority.

Perhaps, as the Majority suggests, the admissibility of the note is not a condition upon which the State's obligation to disclose is evaluated. In this case, however, if the note cannot be connected to anyone and no determination made as to when it was written, then there is no impeachment value whatsoever in it, exculpatory or otherwise.

what happened that night regarding proof at the scene of the sexual act performed on him and about the gun he used throughout the commission of his criminal acts—Youngblood contended that while he had a gun, it was "just the plastic one"!

The evidence of the State with regard to the first sexual assault committed against Katara N. was that Youngblood placed a revolver against her head and made her perform oral sex on him. Youngblood later pointed the revolver at his friend and accomplice, Joseph Pitner, to prevent Pitner from leaving the scene. Thereafter, Youngblood waived the revolver in the vehicle at the three women, ages 16, 15 and 18, thereby committing two acts of brandishing and one act of wanton endangerment. The wanton endangerment with the revolver was specifically directed at Wendy S. Later, the revolver was in sight when Youngblood sexually assaulted Katara N. a second time.[2] It is indeed unfortunate that in the Majority's rush to gift Youngblood with a new trial, it ignores the compelling nature of the State's physical confirmation of Katara N.'s account[3] and the devastating effect which Youngblood's affirmative attempt to mislead investigators had on the jury's reasoned verdict of guilt.

Information withheld or not provided by the prosecution, even if at the time unknown

to the prosecution, is not material, for *Brady* purposes, "unless the information consists of, or would lead directly to, evidence admissible at trial for either substantive or impeachment purposes." *United States v. Phillip*, 948 F.2d 241, 249 (6th Cir.1991); *United States v. Kennedy*, 890 F.2d 1056, 1059–60 (9th Cir.1989), *cert. denied*, 494 U.S. 1008, 110 S.Ct. 1308, 108 L.E.2d 484 (1990). Inadmissible evidence is, by its definition, not material for *Brady* purposes because it never would have reached the jury and therefore could not have affected the trial's outcome. *United States v. Ranney*, 719 F.2d 1183, 1190 (1st Cir.1983). In determining whether evidence that the prosecutor does not disclose to the defendant which could be used to impeach a prosecution witness is material to the defendant's case, it is the job of the *appellate* court to determine what evidence would technically be admissible, and what portion of that evidence the trial court would allow under the discretion granted to the trial court under our rules of evidence dealing with the admissibility of evidence of specific acts of a witness for impeachment purposes. *U.S. v. Veras*, 51 F.3d 1365, 1375 (7th Cir.1995); *see also* Rule 608(b) of the West Virginia Rules of Evidence.

Sadly, the Majority attempts no such determination prior to its vacating of the guilty verdicts below.[4] Rather the Majority seems

2. As indicated in the opinion filed in 2005, the circuit court required Youngblood to wear a stun belt during the voir dire process, in part, because, in addition to the charges herein, Youngblood was facing a felony murder charge in another case.

3. Law enforcement located Youngblood's sperm in a trash can at Pitner's residence exactly where Katara N. stated that evidence of the sexual assault would be found. According to the record, Trooper Peer testified that when he asked Youngblood "is there anyway [sic] your sperm could be in a trash can at Joe's?", Youngblood responded, "no." This accuracy of Youngblood's untruthful statement to investigators was confirmed in Youngblood's written statement which was introduced without objection at his trial below and which is the *only* evidence in the record of Youngblood's account of what transpired. It goes without saying that this sexual act, verified by physical evidence, is not the same type of sexual act purportedly involving Youngblood and Katara N. which was referenced in the note at issue.

4. The Majority's rush to reverse may perhaps be based, at least in part, on its mistaken belief that the United States Supreme Court's remand was, instead, a reversal. It was not. By the terms of the order itself, what is commonly referred to as a "GVR" order, this case was remanded simply for the benefit of our review of Youngblood's *Brady*, claim: "*If this Court is to reach the merits* of this case, it would be better to have the benefit of the views of the full Supreme Court of Appeals of West Virginia on the *Brady* issue." *Youngblood v. West Virginia*, —— U.S. ——, 126 S.Ct. 2188, 2190, 165 L.Ed.2d 269 (2006) (emphasis added). The United States Supreme Court's *actual* language in the remand order simply does not comport with the Majority's apparent belief, as reflected in footnote 11 of its opinion, that the GVR order instead may have been "a prima facie [determination] that the judgment below is in error." *Citing* Martin, "Gaming the GVR," 36 Ariz.St.L.J. 551, 564–5 (2004) (internal quotations and citations omitted).

The Majority's misunderstanding appears to stem from its misapprehension of how the GVR order was actually applied in *Lawrence v. Chater,*

content to blindly plunge forward into questionable legal channels by relying on conjecture based on supposition founded on guesswork. No attempt is made to ascertain the provenance of the note or to determine its authenticity—a note supposedly found by and within the control of family members of Youngblood's accomplice, Pitner. In anticipation of the new trial, the Majority states that it *might* be brought out, this time in conjunction with the unidentified note, that Katara N. had the ability to flee after the first sexual assault or to speak to the police when they approached the vehicle containing the three women. This assumption simply ignores the physical support at the scene of the crime which verifies Katara N.'s account and shows Youngblood to have lied about the events. It also ignores Youngblood's statement about the weapon he used to perpetrate his crimes. It must be remembered that, at the point of the second sexual assault, the evidence indicated that Youngblood had already used the revolver twice: (1) by placing it to Katara N.'s head during the first sexual assault and (2) by preventing Pitner from leaving the scene. According to the State's unrefuted evidence, Youngblood also threatened all three women with the revolver and had it in sight during the second sexual assault.

Furthermore, with respect to Youngblood's sexual assault of Katara N., the note is simply not credible on its face. The note makes no mention whatsoever to the sexual act to which Katara N. testified, which Youngblood denied in his statement (which was available to the jury), and which *was* physically verified by the objective evidence of the investigation which was admitted into the record. Even if impermissibly offered as hearsay for the truth therein asserted, the note references a different purported sexual act for which there is no other mention whatsoever in the proper record of this case. Thus, the complete circumstances surrounding the actual evidence at trial and the unconvincing nature of the note in question do not support the potential import of the note which the Majority attempts to suggest.[5]

The State did not violate *Brady*. The note, even if credible, would not have made a difference in the trial's result because, while it may be argued that the note could have impeached its author (which was not Katara N.), it could not have come in for substantive consideration by the jury because it was inadmissible hearsay. Furthermore, the note's accuracy was fully and powerfully undermined by Youngblood's own statement (in which he admitted to no sexual act by Katara N. whatsoever and in which he affirmatively lied to investigators) and the objective physical evidence found by investigators at the scene of the crime which substantiated Katara N.'s account of what happened.[6] The note was simply not material.[7]

516 U.S. 163, 116 S.Ct. 604, 133 L.Ed.2d 545 (1996), compared to this case. Justice Scalia's dissent above proves noteworthy on illuminating the Majority's error. Therein, Justice Scalia observes that the GVR order in the instant case does not fall within *any* of the Court's prior GVR cases:

> The [United States Supreme] Court does not invoke even the flabby standard adopted in *Lawrence*, namely whether there is a "reasonable probability that the decision below rests upon a premise that the lower court would reject if given the opportunity for further consideration." 516 U.S. at 167, 116 S.Ct. at 606, 133 L.Ed.2d at 554.

—— U.S. ——, 126 S.Ct. at 2191–92, 165 L.Ed.2d at ——————— (Scalia, J., dissenting). Thus, contrary to the Majority's conclusion, the remand herein is *not* a thinly veiled direction to alter our course. Rather, it is an order that recognizes that the *Brady* decision is pertinent in this case. It requires this Court to determine whether we believe anything in *Brady* demands a different result. That is all. Nothing more.

5. Moreover, the Majority opinion incorrectly states that the residences of Youngblood and Pitner, where the sexual assaults were said to have taken place, were in Berkeley Springs. As indicated in this Court's original opinion, however, Youngblood and Pitner lived *near, or in the area of*, Berkeley Springs, and when Wendy S. made the 911 call, she stated that she and the other two women were at an unknown location.

6. Youngblood's counsel sought throughout Katara N.'s testimony to attack her credibility. Obviously, the jury did not agree and considered all of the evidence together which compelled them to return a guilty verdict. It is equally obvious that the jury trusted the credibility of Katara N. more so than the account of Youngblood present in his voluntary statement given to investigators which was admitted into evidence without objection.

7. A comment regarding Youngblood's contention that he relied upon a defense of consent is appropriate. The Majority accepts without question

Simply stated, the prosecution's failure to disclose a note that may have served as possible impeachment material for a corroborating prosecution witness's credibility, did not constitute a *Brady* violation since Youngblood fails to show that the note would have put the whole case in such a different light as to undermine confidence in the verdict. Neither Kimberly K. nor Wendy S. were principal witnesses against Youngblood on the sexual assault charges, nor was their testimony "the glue that held the prosecution's case together." *Schad v. Schriro*, 454 F.Supp.2d 897, 911 (D.Ariz.2006), *quoting Horton v. Mayle*, 408 F.3d 570, 579 (9th Cir.2005).

The Majority also revisits the post-trial hearing concerning the note and quotes testimony therefrom while disregarding the conclusion reached by the circuit court. Finding that the note was not the type of evidence justifying a new trial, the circuit court stated that, although the note might have been used for impeachment:

> the Court would however in looking at the note not see it as an act of gratitude or thankfulness for receipt of sexual attention but sees it as rather a spiteful or vindictive act or in this rather bitter irony a get-back for an offense is what the note appears to read.

Contrary to the opinion of the Majority, this was a call for the circuit court to make following the evidentiary hearing, and this Court should have been reluctant to set aside Youngblood's convictions, particularly the convictions legally distinguishable from the

sexual assaults. The note did not fall within the category of impeachment evidence considered to be so exculpatory that the outcome may have been different.

Finally, the Majority sets forth a misstatement of the law in its introductory discussion. In remanding the case for a new trial upon all charges, the Majority, citing a case involving contract law, states that, except for the *Brady* issue, the "resolution" of the remaining issues remain the law of the case on remand to the circuit court. That is incorrect. At this point, the law of the case upon remand is not that the Rule 404(b) evidence will be admitted or that Youngblood will necessarily wear a stun belt. Those issues are among matters to be determined anew upon evidentiary proffers at a future trial. The sexual assault convictions aside, the Majority even holds that Youngblood no longer stands convicted of indecent exposure, brandishing and wanton endangerment with the revolver.[8]

Youngblood's convictions should have been affirmed. Accordingly, I dissent.

STARCHER, Justice, concurring.

(Filed June 12, 2007)

I join the majority opinion and write separately to address several points.

First, to characterize an opinion written by a Justice of this Court as giving a "gift" to a criminal defendant, as the dissent does, is mistaken. No responsible jurist will reverse

that Youngblood defended himself by contending that any sexual encounter was consensual. A review of the record is enlightening. No where in the opening statement of Youngblood's counsel is there any indication that Youngblood intended to use a defense of consent. No where in Youngblood's case is there an indication that Katara N.'s oral sex on Youngblood was consensual. No where in Youngblood's case was any evidence introduced to question the statements Youngblood made to investigators, which were made a part of the record, that evidence for such sexual activity would not be found at the place of the activity. Only once, in closing, did Youngblood's counsel reference consent with respect to the issue of Katara N. being forced to have oral sex on Youngblood in the presence of a gun. The jury was certainly cognizant of this shift from Youngblood's initial position in his statement and his attorney's later suggestion that, if it hap-

pened, it might have been consensual—and this realization by the jury of the inconsistency in Youngblood's initial and ultimate positions no doubt was not beneficial to Youngblood, as evidenced by the jury's verdict.

8. As the Majority states later in the opinion: "[B]ecause all of the charges were factually intertwined our resolution of the *Brady* and *Hatfield* issue impacts the disposition of all of the charges." However, although the events in question were part of a "complete story" or continuing episode, that does not mean that all of the convictions, each with differing legal elements such as the weapon violations, should be set aside. Rather, the intertwining nature of the events more appropriately related to the basis for admitting the Rule 404(b) evidence in the first place.

a jury verdict unless there is a bona fide belief that serious legal unfairness has occurred. And a fair trial is not a "gift"—it is the *right* of every defendant.

Second, the simple facts and legal reasoning underlying the result reached by the majority opinion in the instant case were clearly discerned by the United States Supreme Court when it sent the case back to this Court. A police officer obtained a document that called into question the veracity of one or more major prosecution witnesses; the document would likely have been a powerful cross-examination tool for the defendant; and the document should have been disclosed by the State to the defendant. Because the document was not disclosed, a new trial is required. It is that simple.

Third, I want to briefly address the issue of the circuit court's requirement that the defendant wear a "stun belt" during his trial. Stun belts are fearful and exceptionally coercive devices that should be used only in the most extraordinary situations. I believe that the leading cases on the use of stun belts on defendants during a trial are still *U.S. v. Durham*, 287 F.3d 1297 (2002) and *People v. Mar*, 28 Cal.4th 1201, 124 Cal.Rptr.2d 161, 52 P.3d 95 (2002). I also believe that this Court should follow the reasoning of these cases. It would behoove circuit courts, prosecutors, and defense counsel to cleave to these cases' teachings if the issue of possible stun belt use arises. I would also apply a strict standard and would presume both harm and reversible error from the use of a stun belt—if a circuit court does not follow thorough pre-use procedures, to determine a stun belt's necessity and propriety *vel non*.

Accordingly, I concur.

MAYNARD, Justice, dissenting.

(Filed June 27, 2007)

I strongly dissent. This dissent first outlines with bullet points all of the reasons for the dissent, and then focuses in more detail on a few specific areas of importance.

- The note is not exculpatory.
- The ruling of the majority stands in stark contrast to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
- We have no idea who wrote the note, when it was written, where it was written, or even why it was written.
- The note, even if authentic, is hearsay-if not double hearsay-and clearly would not be admissible during a re-trial.
- There is no credible evidence that State Police Trooper Peer saw, read, touched, or even heard of this alleged exculpatory note until the evidentiary hearing three years after the note was allegedly written and found by the co-defendant's aunt.
- There is simply no credible evidence that Trooper Peer *ordered* the destruction of any note.
- I am very troubled by the fact that the majority of this Court has allowed the word of a co-defendant's aunt, more than three years after the alleged discovery of the note, to tarnish the credibility of a well-qualified State Police officer.
- This Court is setting a very dangerous precedent by attributing knowledge to a State Trooper three years after the fact based *solely* upon the testimony of a co-defendant's relative, and then attributing that alleged knowledge to the prosecution.

This case required the Court to determine whether Mr. Youngblood's conviction should be reversed due to a potential violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In considering the majority's decision in this case, as indicated earlier, it is disturbing that this Court has allowed the word of a co-defendant's relative, more than three years after the alleged discovery of the note occurred, to tarnish the credibility of a hardworking and well-qualified State Police officer.

The majority opinion states: "The testimony of Ms. Miles and her daughter inform this Court that the State was in possession of the note and *ordered* that it be destroyed. We are deeply troubled by the State's conduct in this matter." The majority opinion goes on to specifically conclude that the "State suppressed the note by failing to keep it and

ordering its destruction." These strongly and unfairly worded conclusions in the majority opinion are wholly unsupported by the record before this Court. After considering all of the testimony below, it is inconceivable to me how the majority could conclude that Trooper Peer "ordered" Ms. Miles to destroy the note.

In order to fully explain the problems with the majority opinion, we must explore some of the underlying facts either glossed over or ignored completely by the majority. First, let us be clear about why the officer was at Ms. Miles' home that day. He showed up at Ms. Miles' home following a call from her stating that Katara, Kimberly, and Wendy had vandalized many of her household items including milk, ice cream, medicines, and her family's tooth brushes. According to Ms. Miles, that was when she showed the officer the note and that he supposedly told her to throw it away with the damaged items of food. Her testimony in that regard was as follows:

Q. Could you explain to the jury what happened?

A. Two days after [the police collected other evidence from my home,] I found shampoo in my milk and all kinds of things happened to my food. I keep a phone book by my phone and in that phone book when I was going through it to get my bills out, I seen a note. I called Officer Peer back two days later and he came up and he looked at it. I told him about the shampoo in my milk and all he told to me was to throw everything away, throw everything out.

Q. Now, apparently your house had been, I guess, trashed?

A. Vandalized my food and stuff, yes.

During cross examination by the prosecution, the following exchange occurred with Ms. Miles.

Q. Do you know who wrote that note?

A. No, ma'am, I sure don't.

Q. When Trooper Peer told you to throw the stuff out he was talking about your milk and shampoo?

A. Well, I assumed that.

Q. You were complaining about that to him?

A. Right.

Q. You were complaining to him about vandalism that had occurred in your home?

A. That is correct.

Q. Is that a fair assessment of why you had called him out there?

A. That is why I called him out there to smell my milk, you could smell shampoo in it and all kinds of stuff. I called him out there, I wanted him to see [for] himself and smell [for himself], that is when I found the note.

Trooper Peer, on the other hand, explained and testified under oath that he had not seen the note and did not instruct Ms. Miles to throw it away. He did, however, recall the conversation with Ms. Miles wherein she told him that some of her household items had been tampered with, upon which he instructed her to simply throw those items in the trash. Questioning of Trooper Peer by the prosecution was as follows:

Q. Do you recall the events concerning Ms. Miles' complaint about her milk or items in her house?

A. Yes.

Q. Okay. Tell us what you recall about that?

A. I can't. I don't recall going out there. I thought she had made a phone call to the office and told me that there had been something placed in her milk or shampoo or something. I don't remember the exact conversation but I probably did tell her to just dispose of it.

Q. Okay. And why would you have told her to dispose of it?

A. If there was something in her milk, I mean, I wouldn't have wanted to drink it neither.

Q. You didn't deem it to be any criminal violation that point in time based on what was going on?

A. No, I mean, I was working a sexual assault and I didn't see where something being placed in milk had anything to do with that.

Q. Do you have any recollection of seeing a note?

A. No, I don't.

Q. I prior to this showed you a copy of Defendant's Exhibit 1 [The note], correct?

A. Yes.

Q. That was provided to me from defense counsel, do you have any recollection of having seen that?

A. No, I don't. I looked at your copy that you had prior to this, I don't recall seeing this.

Q. And your understanding of Ms. Miles' complaint had to do with vandalism?

A. Correct.

Q. Complaint had nothing to do with sexual assault?

A. Correct.

During cross examination of Trooper Peer by Mr. Youngblood's counsel, the following exchange occurred.

Q. And you indicate that you do acknowledge or you do recall a discussion with Ms. Miles about her house being vandalized?

A. About shampoo or milk or something, yes.

Q. And you recall or do you recall her making any reference to any note or any document that explained what had occurred that her findings were consistent with the note?

A. No, I don't.

During further questioning, Trooper Peer explained that he did not specifically recollect actually going to Ms. Miles' home that day. However, he did recall discussing the alleged vandalism on the telephone with Ms. Miles. With that in mind, the following questioning of Trooper Peer by the prosecutor occurred.

Q. Even if you did go out there to the house is it your testimony today that you have no recollection of ever having seen that note?

A. Correct.

Q. Again, it was just a vandalism complaint about some milk and shampoo?

A. Yes.

During subsequent recross-examination by Mr. Youngblood's counsel, Trooper Peer remained steadfast in the fact that he did not see the note.

Q. So within a few days after the incident, since I presume you were doing other things other than just this case, I mean, is that correct?

A. Yes.

Q. It is possible that you may not have realized if you had been shown the note or the note had been described to you or presented to you, you may not have realized the significance of the note or what was in the note at least at that point in time since it was the commencement of the investigation?

A. I don't remember seeing the note.

Q. But we know at least you recall having the conversation with Ms. Miles although you don't recall the note?

A. Yes.

Q. And you agree that the general gist of the conversation was consistent with her testimony?

A. Yes.

Trooper Peer's testimony clearly shows that he did not take the note into his possession and that he was never shown the note. His testimony is unequivocal and unwavering on that fact. Nevertheless, the majority accepts Ms. Miles' story that more than three years after Trooper Peer came to her home, and after Mr. Youngblood's conviction, Ms. Miles suddenly re-discovered the note in a trash can during a discussion with an investigator for Mr. Youngblood. The majority appears to believe that Trooper Peer is a rogue cop who ordered Ms. Miles to throw away evidence that was potentially beneficial to her nephew who was in jail. The majority also appears to believe Ms. Miles over Trooper Peer despite the fact that Ms. Miles had a motive to lie, and the fact that had Trooper Peer had none, and ignores the fact that if he

wanted to ensure the note's destruction, he simply could have taken the note with him and destroyed it himself rather than order Ms. Miles to do it. The majority's convoluted analysis just does not make any sense.

I readily recognize that in *Brady v. Maryland, supra,* there was a clear case of a state violating a citizen's right to *due process.* The prosecution in *Brady* withheld a written confession that was clearly material to the defense of that defendant. *Brady,* however, is monumentally distinguishable from the instant case. With regard to Mr. Youngblood, there is insufficient credible evidence both to support the existence of alleged exculpatory evidence or that the State had any knowledge of it. If Trooper Peer did not see the note, and he said under oath that he did not, then knowledge of the note cannot be imputed to the prosecutor. Also, if Trooper Peer did not see the note, he obviously could not have withheld it, ordered it destroyed, or suppressed it in any way.

There are obvious discrepancies in Ms. Miles' evaluation of the note between the time she discussed her tainted milk and ice cream with Trooper Peer and the time she met with Mr. Youngblood's investigator three years later. Perhaps equally troubling, as discussed earlier, is the fact that this Court is siding with a co-defendant's relative with much to gain, over the testimony of an experienced public servant who had nothing to gain by lying about the note. The true fact is that we do not even know the origin of the note as far as who specifically wrote it or even when it was written. Moreover, to believe that the State withheld evidence in this case you have to believe everything that Ms. Miles has stated and nothing that Trooper Peer says. It is that simple. I believe this Court is setting a very dangerous precedent by attributing knowledge to a State Trooper three years after the fact based *solely* upon the testimony of a co-defendant's relative, and then attributing that alleged knowledge to the prosecutor.

Therefore, for the reasons set forth above, I respectfully dissent.