No. 15-1220  -     *State of West Virginia v. Quinton Peterson*

**FILED**
**April 20, 2017**
released at 3:00 p.m.
RORY L. PERRY, II CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

Davis, Justice, dissenting:

In this proceeding, the defendant, Quinton Peterson, was convicted of first degree murder and sentenced to life imprisonment without the possibility of parole. Here, Mr. Peterson sets out several assignments of error. The majority opinion rejected all of the issues raised as being without merit. However, I believe one of the issues raised had merit and warranted the conviction being reversed and a new trial being awarded. Consequently, for the reasons set out below, I dissent.

The issue raised by Mr. Peterson that had merit involved his assertion that the State suppressed material evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). In resolving this issue, the majority opinion conveniently omitted relevant facts which, as I will show, established a *Brady* violation.[1]

---

[1]I would be remiss if I did not note that the tenor of the case *sub judice* bears an eerie resemblance to this Court's previous decision in *Youngblood I*, wherein the Court determined that no *Brady* violation had occurred and from which decision I dissented. *See State v. Youngblood*, 217 W. Va. 535, 618 S.E.2d 544 (2005) (per curiam) (*Youngblood I*). Thereafter, Mr. Youngblood appealed from this Court's ruling, and the United States Supreme Court vacated this Court's decision in *Youngblood I*, remanding the case with directions for this Court to rule upon the *Brady* violation. *See Youngblood v. West Virginia*, 547 U.S. 867, 126 S. Ct. 2188, 165 L. Ed. 2d 269 (2006) (per curiam). On remand, this Court concluded that a *Brady* violation had, in fact, occurred and awarded Mr. Youngblood

The record shows that during the initial investigation of this case, the police spoke with a man named Antonio Smith. Mr. Smith knew Mr. Peterson and had played dice with him, a few days before the victim was murdered, at the home of Ms. Erin Stolze. During Mr. Smith's initial contact with the police, he informed them only that he knew Mr. Peterson, and he knew where he lived. As a result of the limited information provided to the police by Mr. Smith, Mr. Peterson had no reason to believe that there was anything relevant to his case that occurred during the dice game at Ms. Stolze's home. It was not until the day before trial that the State informed Mr. Peterson, for the first time, that the State was calling Mr. Smith as a witness to provide evidence about events at the dice game at Ms. Stolze's home. The record does not disclose that Mr. Peterson was informed of the exact nature of Mr. Smith's anticipated testimony. The State also indicated to Mr. Peterson that Ms. Stolze had been contacted and that the State would not be calling her as a witness. On the first day of trial, counsel for Mr. Peterson placed on the record his understanding of the contact made by the State with Ms. Stolze on the day before trial. The following exchange occurred regarding this issue:

---

the new trial to which he was entitled.

Rather than learning from the errors of its past, however, this Court seems to be repeating its same mistakes in this case by refusing to recognize that a *Brady* violation has occurred, which violation, I submit, is even *more egregious* than the *Brady* violation at issue in the *Youngblood* case. I only hope that Mr. Peterson and his counsel remain vigilant in their quest for a fair adjudication of Mr. Peterson's guilt so that he, too, will receive the same opportunity for a fair trial as did Mr. Youngblood.

THE COURT: . . . [Defense counsel] said he needed to put a couple things on the record and so–well, go ahead.

DEFENSE: . . . I needed to–we haven't asked about this. But the State has ongoing duties under [Brady] and I wanted to see if we couldn't get something here out of [the State] about [Brady].

THE STATE: No, I disclosed things yesterday regarding the new information from Antonio Smith and things going on at Erin's–

DEFENSE: And she is not being called as a witness?

THE STATE: That's right.

DEFENSE: We do know where she is. She was disclosed to us and we agree there is nothing there. I thought we needed to clean that up. There is no exculpatory evidence that you know of Mr. Chiles?

THE STATE: No.

DEFENSE: And you sought that out?

THE STATE: Oh, yes.

Based upon the above colloquy, Mr. Peterson and the court were informed by the State that no *Brady* evidence existed regarding Ms. Stolze. However, as I will show below, the State knew of *Brady* material involving Ms. Stolze at the time it denied the same in open court.

During the trial, the State called Mr. Smith to provide evidence of premeditation and motive in the killing of the victim. Mr. Smith informed the jury that the murder victim was the winner of the dice game at Ms. Stolze's home, and that Mr. Peterson

3

was the big loser.  Mr. Smith stated that Mr. Peterson lost approximately $400 to $500 at the first dice game.  According to Mr. Smith, a fight almost broke out between the victim and Mr. Peterson.  Mr. Smith informed the jury that Mr. Peterson stated, "Damn, I wish I had my gun," as he was leaving Ms. Stolze's home.  Mr. Peterson took the stand and denied the allegations made by Mr. Smith.

Subsequent to Mr. Peterson's conviction, he learned that the State had interviewed Ms. Stolze the day before the trial, and was given a version of events about the dice game which completely contradicted Mr. Smith's sworn version of the events.  Ms. Stolze informed the State that Mr. Peterson won the dice game at her home, not the victim.  According to Ms. Stolze, Mr. Peterson won about $100.  Ms. Stolze stated that the victim got upset when Mr. Peterson decided to leave and stated, "Oh, really, you are not going to let me–or give me a chance to make up or get my Hundred Dollars back?  Like, go on with that bitch-ass-shit. Take my bitch-ass One Hundred Dollars."  Ms. Stolze informed the State that no threats were made and that she did not observe any guns.  Ms. Stolze also specifically informed the State that she did not hear Mr. Peterson say, "Damn, I wish I had my gun."

It is in the above context that Mr. Peterson's *Brady* claim should be reviewed. The parameters of a *Brady* violation were set out in Syllabus point 2 of *State v. Youngblood*, 221 W. Va. 20, 650 S.E.2d 119 (2007), as follows:

4

There are three components of a constitutional due process violation under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and *State v. Hatfield*, 169 W. Va. 191, 286 S.E.2d 402 (1982): (1) the evidence at issue must be favorable to the defendant as exculpatory or impeachment evidence; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must have been material, *i.e.*, it must have prejudiced the defense at trial.

The majority opinion correctly found that the first element under *Youngblood* was satisfied. That is, the majority opinion concluded that "Ms. Stolze's statement supports Defendant Peterson's testimony and tends to impeach Mr. Smith's version of events during the dice game. For these reasons, we find the first element of *Youngblood* is satisfied."

In its analysis of *Youngblood's* second factor, the majority opinion found that Mr. Peterson failed to satisfy this element. The majority's analysis of this issue was patently wrong. Under the second element of *Youngblood*, it must be shown that the State willfully or inadvertently suppressed impeachment evidence. In a footnote in *Youngblood*, the meaning of "suppressed" in the context of a *Brady* violation was explained as follows:

We will note that evidence is considered suppressed when [1] the existence of the evidence was known, or reasonably should have been known, to the government, [2] the evidence was not otherwise available to the defendant through the exercise of reasonable diligence, and [3] the government either willfully or inadvertently withheld the evidence until it was too late for the defense to make use of it.

*Youngblood*, 221 W. Va. at 31 n.21, 650 S.E.2d at 130 n.21 (internal quotations and citation omitted).  As to the first suppression factor, the majority opinion readily admitted that the State knew of Ms. Stolze's impeachment statement "on the day before trial."[2]

As to the second suppression factor, the majority opinion determined that because Mr. Peterson knew about Ms. Stolze, he could have, through the exercise of reasonable diligence, learned about her impeachment statement before trial.  This conclusion is inconsistent with the evidence.  As I pointed out previously, prior to the day before trial, Mr. Smith was not listed as a witness.  All that the State had revealed to Mr. Peterson was that Mr. Smith identified him to the police.  Without any further information about Mr. Smith, there was no need for Mr. Peterson to contact Ms. Stolze to see what she could say about the dice game.  Mr. Peterson was led to believe the dice game was not an issue.  The dice game at Ms. Stolze's home did not become an issue until the day before trial, when the State informed Mr. Peterson that it was calling Mr. Smith to testify about the dice game.  Moreover, as testified to by the State on the day of trial, it interviewed Ms. Stolze and

---

[2]The majority opinion disingenuously stated that it was "undisputed" that the State knew about Ms. Stolze's impeachment statement.  However, the testimony of the officer who interviewed Ms. Stolze denied knowledge of the impeachment version of her statement.  In fact, the officer testified that he did not record her statement because it was "consistent" with Mr. Smith's statement.  It is clear that the majority opinion believed Ms. Stolze's version of her statement and not the purported failed memory of the officer.  Therefore, it would have been more correct for the majority opinion to have acknowledged that it disbelieved the officer, rather than state that the issue was "undisputed."

6

determined that she did not have any *Brady* evidence, *i.e.*, her version of the dice game was consistent with Mr. Smith's. Further, the record does not disclose that Mr. Peterson actually knew the substance of Mr. Smith's testimony until he testified.

Under these facts, Mr. Peterson had no reason to suspect that Ms. Stolze had any relevant testimony. The State knew differently, and the majority opinion so found, but the State suppressed that information. Consequently, the majority opinion was wrong in concluding that the evidence demonstrated that Mr. Peterson, through the exercise of reasonable diligence, could have learned of Ms. Stolze's impeachment evidence before the trial.

As to the third suppression factor, whether the evidence was intentionally or inadvertently suppressed, it is clear to me that the evidence was *intentionally* suppressed. The police officer who interviewed Ms. Stolze denied any recollection of her having given a statement that was inconsistent with Mr. Smith's. The officer conveniently stated that he did not record her statement because it was not inconsistent with Mr. Smith's statement. However, Ms. Stolze testified that after she told the police officer what actually happened at the dice game, the officer said "someone was lying through his teeth." This statement demonstrates the intentional suppression of *Brady* evidence. The officer knew he had conflicting statements from two potential witnesses–one statement supported Mr. Peterson's

7

guilt, and the second statement impeached the veracity of the first statement. The State, through its agents the police officer and/or the prosecutor, made the decision to intentionally suppress the impeachment statement. For purposes of *Brady*, it is of no moment as to whether the police officer actually informed the prosecutor about Ms. Stolze's statement. *See* Syl. pt. 1, *Youngblood*, 221 W. Va. 20, 650 S.E.2d 119 ("A police investigator's knowledge of evidence in a criminal case is imputed to the prosecutor. Therefore, a prosecutor's disclosure duty under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963) and *State v. Hatfield*, 169 W. Va. 191, 286 S.E.2d 402 (1982) includes disclosure of evidence that is known only to a police investigator and not to the prosecutor.").

Under the final element of *Youngblood*, the suppressed evidence must have been material or prejudiced the defense at trial. The majority opinion found that the impeachment evidence was not material. The United States Supreme Court has made clear that "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S. Ct. 1555, 1566, 131 L. Ed. 2d 490 (1995). Rather, all that is required is a "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435, 115 S. Ct. at 1566, 131 L. Ed. 2d 490. The facts of this case clearly demonstrate that, as a result of Mr. Smith's testimony, Ms. Stolze's

8

impeachment testimony was material and critical for Mr. Peterson.

During the State's closing argument in the case, the State referred to the testimony of Mr. Smith at least eight times as follows:

> (1) "We have Antonio Smith telling you that before this murder about the dice game a few days before at Erin's house. Now, the defendant admitted a lot of what Antonio said but then denied the harmful things."

> (2) "Did Antonio Smith have anything to gain or lose when he came into this court? Does this defendant? You judge the credibility of the witnesses. Who was telling the truth? Who was lying? Who has the most to gain or lose?"

> (3) "Antonio Smith also told you that before the murder because of that dice game when he–when the defendant lost Three or Four Hundred Dollars that the defendant quit because he was out of money; that the defendant was getting angry because [the victim] was maybe bragging a little bit and joking and getting the defendant a little fired up. And Antonio told you that he heard the defendant say, 'I wish I had my gun.'"

> (4) "And we have Antonio as part of the–before being with [the victim] Saturday night into early Sunday morning saying that the rematch was going to be Sunday. Now, how in the world did Antonio know that except for [the victim] telling him that? And you know what? There was absolutely no, nobody suggesting, nobody doing anything to suggest that Antonio was actually there Sunday, knew they were throwing dice or anything else. If the defendant himself admits those things happened it's funny how Antonio knew things on what [the victim] told him the night before that that was going to happen. Otherwise, how would he have known to tell officers that? Not just here in court, but back in November of 2007."

> (5) "Antonio, again, had no reason to lie about anything? He

9

didn't have a horse in this race."

(6) "But Antonio knew about the dice game because he was there, and he knew that the other one was going to happen on Sunday because [the victim] told him so Saturday night. Again, Antonio couldn't have made that up. He knew about it because [the victim] said it. Otherwise, he wouldn't have even known that it happened. But he said it was going to because [the victim] told him so."

(7) "Why would Antonio make up the defendant saying 'I wish I had my gun'? Everything that . . . Antonio . . . testified about that didn't really hurt the defendant he admitted. . . . Did you catch that? Only those things that hurt him does he deny about Antonio['s] . . . testimony."

(8) "Maybe he can explain why Antonio would lie about who won or lost in that dice game. Maybe he can explain why Antonio would lie about the rematch or the street rule that the loser gets a rematch if he wants it. Maybe he can explain how Antonio would have known Saturday night that the rematch was going to take place Sunday night and how, indeed, Sunday there they are throwing dice again."

It is clear that the State went to great lengths to emphasize to the jury that Mr. Smith's testimony was "harmful" and accurate. The State emphasized the fact that only the self-serving testimony of Mr. Peterson challenged Mr. Smith's testimony. Moreover, the record clearly demonstrates that the jury was focused on Mr. Smith's depiction of the dice game at Ms. Stolze's home because during their deliberations they sent out questions asking about her. The jury particularly wanted to know why Ms. Stolze was not there to testify. The jury wanted to hear from Ms. Stolze because Mr. Peterson testified that Mr. Smith's testimony was not the truth. The jury found both witnesses to be credible on this issue and wanted the

10

testimony of Ms. Stolze to help them decide who was telling the truth. The State denied the jury this material testimony by suppressing it. As a result of this suppression, the jury decided it would credit Mr. Smith's testimony over that of Mr. Peterson. This result is exactly what the State sought to achieve by denying Mr. Peterson his fundamental right to due process. Unfortunately, based upon the decision announced by the majority's opinion herein, due process is no longer a fundamental right. Therefore, I dissent.